David Leroy SKAGGS, Petitioner,

v.

Phil PARKER, Warden, Respondent.

No. Civ.A. 1:96–CV–8–M.

United States District Court,
W.D. Kentucky,
Bowling Green Division.

July 22, 1998.

954

Rodney McDaniel, Department of Public Advocacy, Jason L. Nohr, Kentucky Capital Litigation Resource, Thomas M. Ransdell, Department of Public Advocacy, Frankfort, KY, David Leroy Skaggs, Kentucky State Penitentiary, Eddyville, KY, for Petitioner.

David A. Smith, Office of the Attorney General, Criminal Appellate Division, Frankfort, KY, Ian G. Sonego, Office of the Attorney General, Criminal Appellate Division, Frankfort, KY, for Respondent.

## MEMORANDUM OPINION

MCKINLEY, District Judge.

This matter is before the Court for habeas corpus review pursuant to 28 U.S.C. § 2254. Petitioner, David Leroy Skaggs [hereinafter "Skaggs"], was sentenced to death after a jury found him guilty of the murders of an elderly Glasgow, Kentucky couple. Skaggs' direct appeal was affirmed by the Kentucky Supreme Court. The Kentucky Supreme Court also rejected several collateral attacks on the judgment and sentencing. Fully briefed, this matter is now ripe for decision. For the reasons set forth below, Skaggs' petition for writ of habeas corpus [DN2] is **denied.**

## BACKGROUND FACTS

The background facts of this case were fairly documented by the Kentucky Supreme Court in *Skaggs v. Commonwealth*, 694 S.W.2d 672, 675–76 (Ky.1985):

Herman Matthews was a 76–year–old, semi-retired scrap metal dealer. His wife was 67 years old and frequently helped in the business. Their home was connected to their place of business. He conducted a cash business and always carried large sums of cash on the premises. On May 6, 1981, a neighbor discovered the body of Herman Matthews in his place of business. Later the police found the body of Mae Matthews in the living room. Herman Matthews was shot three times, once in the right chest, once in the lower back and once in the left arm. He also suffered a head injury consistent with being hit with a hammer and not with falling. The head injury and gunshot wounds to the chest and back were each capable of causing death independently of other injuries. Mrs. Matthews suffered two gunshot wounds, one in the left upper chest and one in the left abdomen. One wound occurred while she was standing and the other while she was lying down.

The police investigation led to Columbus, Indiana where they questioned Skaggs. After having him execute a waiver of rights form, the officers noticed dried blood on Skaggs shoes. While the police were examining the shoes, Skaggs fled. After a 20 minute foot chase in which warning shots were fired, Skaggs was apprehended. He was arrested on Indiana charges and returned to the local jail.

On May 14, still in Indiana, the Kentucky police again questioned Skaggs after again advising him of his rights. He told them he was present at the time of the Matthewses killings, but an accomplice, John Davis, pulled the trigger. On May 15, during the trip to Glasgow, Kentucky, Skaggs told police that the footprint on the door of the Matthews house was his and that he had attempted to kick in the door to burglarize.

Police investigation indicated that the alleged accomplice, Davis, was not involved with the crimes. In view of this information, on May 18, 1981, the police again questioned Skaggs and told him that he had a right to an attorney and that one had been appointed for him if he wanted the police to call the attorney. Skaggs indicated that he did not want an attorney, and during the subsequent interrogation, he confessed to having committed the murders of Herman and Mae Matthews during the course of a robbery and stated that he had acted alone.

After a jury trial, Skaggs was convicted of the murders of Herman and Mae Matthews, and he was also found guilty on two counts of robbery and burglary. At the sentencing phase of the murder conviction, the jury was unable to agree on the penalties for the two murders and was subsequently discharged. Approximately three months later, on June 22, 1982, the penalty phase was retried and a new jury selected. Much of the same evidence introduced at the guilt phase of the first trial was introduced at the retrial of the penalty phase. The final judgment sentencing Skaggs to death for the murder of Herman and Mae Matthews was entered on July 15, 1982.

Skaggs now seeks a writ of habeas corpus from this Court alleging thirty-three grounds of constitutional error. In discussing the various issues, the Court will set forth further facts as appropriate.

### Arguments

### I.

*Petitioner's Fourteenth Amendment Rights Were Violated When Petitioner Was Denied Access to Competent Psychological Assistance*[1]

At the guilt phase of the trial, Skaggs presented an insanity defense through the testimony of Elya Bresler ["Bresler"]. Bresler, who testified that he was a forensic pathologist, diagnosed that Skaggs suffered from two mental illnesses: a major depressive disorder and a paranoid personality disorder. Bresler testified that both these disorders constituted mental diseases or defects that would affect Skaggs' ability to reason and his ability to learn right from wrong. Bresler testified that, at the time of the offense, it was "unlikely" that Skaggs was acting "intentionally." Bresler indicated that, as a result of his mental condition, Skaggs lacked a substantial capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. TE IX at 1228–29. Bresler also testified that Skaggs was "constantly" acting under extreme emotional disturbance. *Id.* at 1230–31.

In rebuttal, the Commonwealth called psychiatrist Dr. Pran Ravani ["Ravani"]. Ravani had examined Skaggs after Skaggs had been referred to the Kentucky Correctional Psychiatric Hospital. Ravani testified that Skaggs had a history of alcohol abuse, but no personality disorder or physical illness as a result of the abuse. Ravani also testified that Skaggs had a schizophrenic trend, but not to the point where it could be diagnosed as schizophrenia. Ravani opined that Skaggs did possess the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law.

Although the jury rejected Skaggs' insanity defense and ultimately found Skaggs guilty on all counts, it was unable to reach a verdict in the penalty phase and was discharged.[2] On June 22, 1982, the penalty phase of Skaggs' case proceeded to trial for the second time. Bresler's and Ravani's testimony was essentially the same as their testimony at the guilt phase of the first trial. The jury recommended that Skaggs be sentenced to death for the murders of Herman and Mae Matthews. On July 13, 1982, the trial court accepted the jury's recommendations and sentenced Skaggs to death.

Sometime after the trial and conviction, Skaggs discovered that Bresler had testified falsely concerning his credentials and that he was not a licensed clinical psychologist. In March 1984, Skaggs filed a Kentucky Rule of Criminal Procedure 10.02/10.06 motion for new trial based on this newly discovered evidence. Although the trial court acknowledged Bresler's lack of credentials, it overruled Skaggs' motion for a new trial. Skaggs' appeal to the Kentucky Court of Appeals from denial of the motion was transferred to the Kentucky Supreme Court, which affirmed the decision of the trial court.

In 1994, Skaggs brought a second motion for a new trial pursuant to RCr 10.02 and Kentucky Rule of Civil Procedure 60.02. The bases of the motion were psychological evaluations conducted by Charles Yonts ["Yonts"], a certified psychologist, and Dr. Eric S. Engum ["Engum"], a clinical neuropsychologist. Skaggs claimed Engum's and Yont's diagnoses were radically different from the diagnosis and conclusions presented to the jury through Bresler. The trial court overruled Skaggs' motion and the Kentucky Supreme Court affirmed the decision on appeal.

■ In support of his due process claim that he was denied access to competent psychological assistance, Skaggs relies primarily on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In *Ake,* the Supreme Court held that "fundamental fair-

---

1. In analyzing the merits of this issue, the Court will consider Skaggs' due process claim only as it applies to the guilt phase of his trial. The Court will analyze Skaggs' due process claim as it relates to the penalty phase of his trial in its analysis of the second issue Skaggs presents for habeas review.

2. Bresler and Ravani did not testify at the penalty phase of the first trial. However, the jury was allowed to consider any and all evidence introduced during the guilt phase of the trial in determining Skaggs' penalty.

ness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.'" *Id.* at 77, 105 S.Ct. 1087. *Ake* entitles a defendant access to a competent psychological expert to help ascertain the viability of· an insanity defense and "to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses." *Id.* at 82, 105 S.Ct. 1087. Skaggs maintains that the selection of Bresler as his mental health expert effectively denied him the right to competent psychological assistance to fairly present his claim of insanity.

■ In the present case, the Court finds that the selection of Bresler as mental health expert did not deny Skaggs the opportunity to fairly present his claim. First, the due process clause is violated only if the alleged constitutional violation is the result of conduct fairly attributable to the state. *Stano v. Dugger,* 921 F.2d 1125, 1142 (11th Cir.), *cert. denied,* 502 U.S. 835, 112 S.Ct. 116, 116 L.Ed.2d 85 (1991). Here, the Kentucky Supreme Court found, and the record fairly supports, that Skaggs himself was responsible for Bresler's selection.

> [Skaggs] was offered, but rejected, the services of a state psychiatrist. He was granted funds to select an expert of his own choosing. He selected Elya Bresler and offered him as an expert witness without first making any investigation of his credentials.

*Skaggs v. Commonwealth,* 694 S.W.2d 672, 673 (Ky.1985); *see also Skaggs v. Commonwealth,* 803 S.W.2d 573, 574 (Ky.1990) ("[T]he trial court, after having offered to appoint a psychiatrist, acceded to the defendant's preference for an allocation of funds. The court could have done no more in providing access to competent psychiatric assistance...."), *cert. denied,* 502 U.S. 844, 112 S.Ct. 140, 116 L.Ed.2d 106 (1991). These factual findings are fairly supported in the state court record. Moreover, Skaggs has failed to set forth

evidence to rebut the presumption of correctness accorded these findings pursuant to 28 U.S.C. § 2254(d).

■ Finally, assuming arguendo that Bresler's testimony violated Skaggs' due process right to a fair trial, the error was harmless where it cannot be said that the testimony had a "substantial and injurious effect or influence in determining the jury's verdict." [3] *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Bresler's testimony was favorable to Skaggs and the jury was unaware of his lack of credentials. As noted by the Kentucky Supreme Court, "There is nothing in [the] record to indicate that, had [Skaggs] known the truth about Mr. Bresler, he could have found a bona fide psychologist or psychiatrist whose testimony would have been more helpful to him than was the testimony of Bresler." *Skaggs,* No. 84–SC–1181–TG at 5.

## II.

***Petitioner's Eighth and Fourteenth Amendment Rights Were Violated When the Jury Was Precluded From Hearing Relevant Mitigating Evidence***

· Skaggs' second argument revisits his claim that Bresler's testimony denied him the due process right to a fair trial. Here, Skaggs' focus is on the penalty phase of his trial. Skaggs maintains he was denied his rights under the Eighth and Fourteenth Amendments when the State precluded the jury from considering relevant mitigating evidence. Skaggs asserts that the jury was precluded from considering "the very substantial mitigating evidence" set forth in the reports of Drs. Engum and Yonts because Bresler lied about his credentials and ability to perform the psychological tests Skaggs required.

■ As correctly noted by Respondent, however, *Ake* does not guarantee a constitu-

---

3. The record confirms the state court's findings that the two recent psychological evaluations by Drs. Engum and Yonts actually support the jury's decision to reject Skaggs' insanity defense. Dr. Engum's report states:

> [I]t appears that [Skaggs] does possess the capacity to appreciate the wrongfulness of his

actions and that he is capable of distinguishing right from wrong.... [I]t also does not appear that Mr. Skaggs fulfills the volitional component of the insanity defense.

TR XIII at 77. Nothing in Yonts' evaluation disputes Dr. Engum's conclusions regarding Skaggs' sanity.

tional right of access to psychiatric counsel in the sentencing phase of trial under the present circumstances. In *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1120 (6th Cir.1990) (en banc), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991), the Sixth Circuit held that *Ake* "only guarantees a defendant the right to a psychiatrist at the sentencing phase to oppose the government's psychiatric testimony." This situation does not arise unless the State presents psychiatric evidence to show an aggravating factor. *Id.* "Without a psychiatrist's assistance, the defendant cannot offer a well-informed expert's *opposing* view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the *State's proof of an aggravating factor.*" *Id.* (quoting *Ake*, 470 U.S. at 84, 105 S.Ct. 1087) (Emphasis added in *Kordenbrock* ).

In the present case, the State utilized Dr. Ravani's expertise only to rebut the testimony of Bresler; Ravani's testimony was not needed to show an aggravating factor. In this situation, *Ake* does not provide a constitutional basis for Skaggs' claim.

■ Moreover, the Court finds no constitutional violation under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In *Lockett*, the Supreme Court held that the Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering any aspect of a defendant's character which is mitigating. *Id.* at 604, 98 S.Ct. 2954. However,

> *Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or by judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all.

*Johnson v. Texas*, 509 U.S. 350, 361, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 456, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990)) (Kennedy, J., concurring).

In the present case, the record gives no indication that the sentencing court precluded the presentation of relevant mitigating evidence or that it prevented the jury from considering relevant evidence offered in mitigation. The penalty phase instructions directed the jury specifically to consider extreme mental or emotional disturbance, mental disease or defect, intoxication, Skaggs' character, plus "any other fact or circumstance which you consider mitigating." TR VIII at 1164, 1171. Under the circumstances, the Court finds no constitutional defect.

### III.

***Petitioner Was Denied Effective Assistance of Counsel As Guaranteed by the Sixth and Fourteenth Amendments***

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth a two-prong test for reviewing claims of ineffective assistance of counsel. First, the petitioner must demonstrate cause by showing that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687–88, 104 S.Ct. 2052. The objective standard of reasonableness is "highly deferential" and includes a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 688, 689, 104 S.Ct. 2052. The assistance required of counsel is not that of the most astute counsel, but rather that of "reasonably effective assistance." *Id.* at 687, 104 S.Ct. 2052. Nonetheless, counsel still has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Sims v. Livesay*, 970 F.2d 1575, 1579–81 (6th Cir.1992).

Second, the petitioner must also demonstrate prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In this respect, the Court must ascertain whether counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052; *see also Lockhart v. Fretwell*, 506 U.S.

364, 369–70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (clarifying that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.")

■ Although a state court's findings of fact are entitled to the § 2254(d) presumption of correctness, the cause and prejudice components of the *Strickland* test and the state court's ultimate conclusion regarding counsel's effectiveness present mixed questions of law and fact that the Court must review *de novo. Sims v. Livesay,* 970 F.2d at 1579.

### A. Defense Counsel Failed To Investigate the Qualifications of Defense "Expert" Elya Bresler

■ Skaggs maintains that significant mitigating evidence was not discovered and was not presented to the jury as a result of trial counsel's reliance on Bresler. Skaggs asserts that defense counsel's performance was constitutionally deficient because counsel failed to inquire into Bresler's qualifications. As a result, Skaggs argues, the jury that sentenced him to death failed to hear evidence of his mental retardation, his deficits in all areas of cognitive functioning, his impairment in brain behavior relationships, evidence that he functioned in the brain damaged range, his borderline psychotic condition, and the abuse he suffered at the hands of his father. *See* Petitioner's Brief at 45. Although Skaggs does not contend that any of this evidence would have caused the jury to find him not guilty, Skaggs insists that this evidence would have caused the jury to return a sentence other than death.

On December 15, 1997, the Court held an evidentiary hearing to supplement the record regarding this claim.[4] Former defense counsel Donna Boyte ["Boyte"] testified that she and co-counsel Joe Kirwan ["Kirwan"] were having difficulty finding a psychologist who could meet the trial deadline. Boyte and Kirwan then contacted Bresler, who was available. Boyte had used Bresler in another trial in 1979. When questioned about Bresler's performance in the 1979 case, Boyte responded, "He did fine.... Basically we were presenting an insanity EED defense, and he did okay. I mean he was okay. He wasn't great." Transcript of Hearing at 7. Boyte recollected that, at the time of the other trial, Bresler was working as a psychologist for a comprehensive care facility in eastern Kentucky. When asked what type of investigation she did into Bresler's background and qualifications before utilizing Bresler as a witness on Skaggs' behalf, Boyte responded, "Absolutely none. He was suggesting [sic] to us by Bill Radigan and I think Vince Aprile had used him, and we just assumed he was fine."[5] *Id.* at 6. Boyte indicated that at the time she and Kirwan called Bresler as a witness, they did not realize that he was not a bona fide expert. *Id.* at 9.

Boyte also testified regarding counsels' decision not to have Bresler testify at the penalty phase of the first trial, but to request the trial court for funds to recall Bresler for the penalty phase retrial.

Q. ... Is there—was there some reason that [Bresler] wasn't called at the penalty phase of the initial trial?

A. Yes. Joe Kirwan and I talked after [Bresler's] testimony. My recollection is that Elliott [sic] Bresler's testimony came fairly late in the trial, the guilt phase; and he was awful. He was incoherent. He was talking about things that didn't make sense. You couldn't stop him. You couldn't reel him back in. People in the audience were laughing at him.

So Joe and I talked afterwards. Our initial intent had been to recall him at the

---

4. The state court refused Skaggs' request for an evidentiary hearing on this issue. Thus, no findings were made to indicate what kind of investigation, if any, counsel made regarding Bresler's qualifications or what prompted counsel's decision to hire Bresler.

5. Boyte indicated that, at that time, both Radigan and Aprile worked for the Kentucky Department of Public Advocacy—Radigan as assistant public advocate and Aprile as general counsel.

penalty phase. We discussed it and decided we would be in better shape not calling him than we would be if we called him. So we did not recall him at the penalty phase.

\* \* \* \* \* \*

Q. You said ... that you were dissatisfied with the testimony of Elliott Bresler [sic] and his performance. Did you look for someone else to replace him with for the retrial?

A. No. ... [W]e didn't—we had such a hard time getting any money for somebody for the first trial, we didn't think the Court would give us any more money.

We did make a request for more money for Elliott [sic] Bresler, really and truly thinking that the judge would deny that and maybe we'd have an issue on that. But, no, we did not make a request for money for another expert.

We didn't know what we would put in the motion that we would say, Judge, you know, we think our expert came off really badly. We didn't figure that was grounds for money for another expert.

*Id.* at 8, 18–19.

Kirwan likewise testified that he conducted no investigation into Bresler's credentials, but that he was aware that Bresler had previously done work for the Kentucky Department of Public Advocacy. *Id.* at 21. Kirwan was also familiar with Bresler because Bresler had testified in another Warren County death penalty case. *Id.* at 22, 24. Kirwan stated that he remembered meeting with Bresler at least one time prior to Skaggs' trial to discuss the case. *Id.* at 22. Kirwan also testified that, at the time, he was totally unaware that Bresler was not a bona fide expert. *Id.* at 23.

Under the circumstances, the Court finds that Skaggs cannot established that trial counsels' failure to investigate Bresler's qualifications fell below an objective standard of reasonableness. Counsel selected Bresler based on his availability, his previous contact with the Kentucky Department of Public Advocacy and counsel's experience with Bresler in prior death penalty cases. Counsel thus reasonably concluded that Bresler was quali-

fied to testify regarding Skaggs' mental condition. In light of this fact, counsel's failure to confirm Bresler's credentials was not unreasonable. Moreover, the Court cannot say that it was unreasonable for counsel not to investigate Bresler's credentials following Bresler's poor performance at the guilt phase of the first trial. Although hindsight suggests this would have been an appropriate and reasonable response, the Court cannot say that it is extraordinary for a properly credentialed expert to testify poorly on behalf of his client. Having found that counsel's decision not to investigate Bresler's credentials does not satisfy the first prong of *Strickland,* the Court need not address whether there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.

## B. Defense Counsel Failed to Object to Erroneous First Degree Robbery Instructions

■ Skaggs next assigns reversible error to defense counsel's failure to object to erroneous first degree robbery instructions. Skaggs maintains the instructions permitted the jury to convict him without finding that his use of force was intended to accomplish a theft. The jury instruction pertaining to the first degree robbery charge of Herman Matthews [6] read:

You will find defendant, David Leroy Skaggs, guilty under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

(a) That in this county on or about May 6, 1981, and before the finding of the indictment herein, he took, or stole, a sum of money, or other property from Herman Matthews;

(b) That in the course of so doing and *with the intent* he shot and killed Herman Matthews with a pistol;

AND

6. An identically worded instruction was given as to the robbery of Mae Matthews.

(c) That in so doing David Skaggs was not insane under Instruction No. 10.

TR VII at 890 [Emphasis added].

Skaggs maintains that, properly worded, the robbery instruction should have read "that in the course of so doing and with the intent *to accomplish the theft* he shot and killed Herman Matthews with a pistol." Skaggs maintains that counsel's failure to object to this arguably erroneous instruction allowed the jury to find him guilty of robbery without finding the requisite intent to accomplish the theft. Skaggs asserts that correct jury instructions on robbery were critically important because his death sentence was predicated on a jury finding of murder committed during the course of robbery.

As previously noted, the second prong of *Strickland* requires Skaggs to show prejudice—that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694–95, 104 S.Ct. 2052. In *Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the Supreme Court further explained this requirement:

> Under our decisions, a criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.... Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him. [Internal citations and quotation marks omitted]

In addressing this issue, the Kentucky Supreme Court found and the record fairly supports that "the sole motive for the crimes was the acquisition of money, and that the theft was in fact accomplished." *Skaggs v.*

*Commonwealth,* Ky., 803 S.W.2d 573, 575 (1990). Because the Court is convinced that the robbery verdict would not have changed had more "precise" instructions been given, Skaggs cannot show that "but for" counsel's failure to object to the instruction the jury would not have found Skaggs guilty of first degree robbery. Thus, Skaggs cannot satisfy the prejudice prong of *Strickland.*

**C. Trial Counsel Was Ineffective For Failing To Object To The Trial Court's Definition Of "Aggravating Circumstances"**

At the penalty phase of Skaggs' trial, the court gave an instruction which defined "aggravating circumstances" as "factors to show death is the appropriate sentence." Skaggs alleges that defense counsel was ineffective for failing to object to this instruction. Skaggs maintains that the erroneous instruction *mandated* imposition of the death penalty upon finding an aggravating circumstance.

Nevertheless, the Court agrees with the Kentucky Supreme Court's finding that the jury was "well aware of its option *not* to impose the death penalty, even if it found aggravating circumstances to exist." *Skaggs v. Commonwealth,* Ky., 803 S.W.2d 573, 575 (1990) (Emphasis in original) (quoting *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672, 679 (1985)). Instruction Number 3 states that it is within the jury's discretion to recommend the death penalty, but only upon a finding of aggravating circumstances. TR VIII at 1166, 1173. Instruction Number 4(b) reads:

> If upon the whole case you have a reasonable doubt whether the defendant should be sentenced to death, you shall recommend a sentence of imprisonment instead.

*Id.* Furthermore, in their closing arguments during the penalty phase retrial, both prosecution and defense counsel informed the jury that it was within their discretion whether to impose the death penalty, even upon finding aggravating circumstances.[7]

---

7. Skaggs' counsel noted, "Ladies and gentlemen, the judge has read in his instruction you all can find those aggravating circumstances, and the bottom line is you do not have to sentence David Skaggs to death; and we are not asking you, obviously, to turn him loose." TE XVIII at 2475.

Likewise, the prosecutor stated, "That's a difficult decision, but you should find all of those aggravating circumstances are present and write them out like the court says, regardless of whether you find the death as the appropriate verdict

Therefore, the Court finds that Skaggs again cannot satisfy the prejudice prong of *Strickland.* The jury was well-informed that imposition of the death penalty was discretionary, even upon finding aggravating circumstances. The Court simply is unable to hold that but for counsel's error in failing to object, the result would have been different.

## D. Trial Counsel Was Ineffective In Failing to Move to Supress Skaggs' Confession and Other Evidence Obtained as a Result of Skaggs' Unlawful Detention

Although Skaggs briefly sets forth the facts surrounding this issue in his petition for writ of habeas corpus, Skaggs fails to further address this issue in his brief in support of his habeas petition or in his traverse to the answer. The Kentucky Supreme Court found this same issue defaulted because Skaggs failed to sufficiently plead the issue in his RCr 11.42 motion so as identify the factual contentions raised. *Skaggs,* 803 S.W.2d at 576. In summarily dismissing this claim, the Court noted that RCr 11.42(2) requires that the motion state specific grounds for relief and *facts* supporting those grounds.

▅▅▅▅ The Court need not address the merits of this claim. Absent a showing of cause and prejudice, a federal court may not reach the merits of a claim that has been procedurally defaulted in state court. *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). To show actual prejudice resulting from the asserted error, the petitioner must establish "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). The actual prejudice requirement is not satisfied if there is strong evidence of the petitioner's guilt and a lack of evidence for

his claim. *Id.* at 172, 102 S.Ct. 1584. In the present case, Petitioner has failed to set forth any facts establishing cause for the default. He has also failed to show actual prejudice from the claimed error.

## IV.

### *Skaggs Was Deprived Of Due Process Guaranteed By The Fourteenth Amendment Since His Conviction Was Obtained By the Perjured Testimony Of A Prosecution Witness*

▅▅▅▅ Skaggs maintains that his conviction was predicated upon the perjured testimony of Glenn Morgan Baxter, a ballistics examiner employed by the Kentucky State Police. Baxter testified during the guilt phase of Skaggs' first trial that the gun possessed by Skaggs was the same weapon used in the murders of Mr. and Mrs. Matthews. Specifically, Skaggs alleges that Baxter falsely stated his credentials at trial. In response to the prosecution's questions concerning Baxter's qualifications as a ballistics expert, Baxter stated under oath:

*I have a Batchelor [sic] of Science Degree from Morehead State University.* After being hired by the State Police, we have on-the-job type training where we do prepared studies and examinations under a qualified firearms examiner. After a period of working with these type of environment, we are then sent to other laboratories throughout the United States for work experience and educational benefits from other qualified examiners. Some of these other schools are the FBI Academy, Washington D.C. Police Department, Chicago Police Department, New York City Police Department, and several others. After this period of time, we then go the manufacturers' schools where we have practical experience and knowledge of the working components of the firearms and ammunition components. After this time, we then come back to the crime laboratory, work cases under a qualified examiner, and then go the court systems to be qualified as an

or not so that we will be guided by it." *Id.* at 2465.

expert. This period of training usually lasts about two years.

TE VIII at 1138–39. [Emphasis added]

On April 3, 1987, Skaggs filed in the state court a motion for new trial. Skaggs based the motion on newly discovered evidence that Baxter had committed perjury at Skaggs' trial. Petitioner's Brief at 56. Specifically, Skaggs alleged learning that Baxter had committed perjury in two respects: by testifying that he had a bachelor of science degree and by testifying that the degree related to firearms examination.

Review of the record and relevant state law findings convinces the Court that there is no "reasonable likelihood" that Baxter's false testimony concerning his degree could have affected the judgment of the jury.[8] *See Wernert v. Arn*, 819 F.2d 613, 617 (6th Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."); *Ramos v. Walker*, 744 F.Supp. 422, 429 (E.D.N.Y.1990) ("[C]ourt must determine whether it can be said ... that disclosure of the witness' true credentials would give rise to a reasonable probability that the result would have been different."). Baxter falsely stated that he had a bachelor's degree from Morehead State University; contrary to Petitioner's allegations; Baxter did *not* state nor could the jury reasonably infer that Baxter's degree related to firearms work. Moreover, Baxter did have a great deal of on-the-job experience as a firearms examiner and had attended numerous courses and classes on the subject. Baxter's on-the-job experience and training, in itself, likely was enough to qualify Baxter as an expert. Furthermore, it does not appear that Baxter's testimony was essential to the jury's finding of guilt. Skaggs confessed to the killings and showed the police where the murder weapon was hidden. Moreover,

Skaggs' main defense was insanity. Whether or not Skaggs shot the victims with the subject gun was really not in issue. In light of the overwhelming evidence of Skaggs' guilt, the Court cannot find that disclosure of the fact that Baxter did not graduate from college would give rise to a reasonable probability that the jury would have reached a different verdict, particularly in light of Baxter's obvious qualifications to testify as a ballistics expert.

## V.

***Skaggs' Confessions Were Involuntary And Obtained In Violation Of His Right To Counsel***

■ Skaggs next alleges constitutional error resulting from the state court's refusal to suppress certain incriminating statements made by Skaggs to police officers. The trial court held an extensive suppression hearing on this same issue based on a record identical to that which the Court now considers. The trial court's decision was affirmed on direct appeal by the Kentucky Supreme Court. Pursuant to 28 U.S.C. § 2254(d), the Court will presume the state courts' findings of fact are correct, *see Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982); *Hart v. Marion Correctional Inst.*, 927 F.2d 256, 257 (6th Cir.), *cert. denied*, 502 U.S. 816, 112 S.Ct. 70, 116 L.Ed.2d 44 (1991), unless the Court finds that the facts are not "fairly supported by the record." *Sumner, id*

The facts surrounding the subject statements are as follows. Following the murders, the police investigation led to Columbus, Indiana where police questioned Skaggs after having Skaggs execute a waiver of rights form. During the questioning, officers noticed dried blood on Skaggs' shoes. While police were examining the shoes, Skaggs fled. Skaggs was subsequently apprehended, arrested on state charges and returned to the local jail.

On May 14, 1981, while still in Indiana, Kentucky State Police officers resumed ques-

---

8. Baxter did not testify at the penalty phase of the trial. Since different juries decided the issues of guilt and penalty, the Court finds that

Baxter's testimony had no influence on the jury's decision to impose the death penalty.

tioning Skaggs after advising him of his rights. Skaggs told officers that he was present at the time of the killings, but that another person—John Davis—pulled the trigger. On May 15, officers transported Skaggs to Glasgow, Kentucky. During the trip, one of the officers discussed spiritual matters with Skaggs and advised Skaggs that he could obtain foregiveness for his acts and that telling the truth would help him. Skaggs told police that the footprint on the door of the victims' home was his.[9] Skaggs said he left the footprint while attempting to kick in the door to burglarize the home the morning before the killing.

On the morning of May 18, Skaggs appeared in the Barren Circuit Court for a preliminary hearing. Skaggs advised the Court that he did not want an attorney to represent him and was ordered back to jail. Shortly thereafter, the judge reconsidered and appointed the local public defender, Robert Alexander ["Alexander"], to represent Skaggs. Soon thereafter, but before Skaggs and his appointed counsel had consulted, police went to the Barren County Jail and told Skaggs they wanted to question him further. The police advised Skaggs that the Court had appointed Alexander to represent him and offered to call the attorney before further questioning. Skaggs told the officers he did not want an attorney present. Skaggs then made a taped statement acknowledging that he alone did the killing. Skaggs further told the officers where to locate some of the stolen property and the gun used in the killings. Police subsequently recovered the property and gun.

Officers transcribed the taped statement and returned to the jail the next day to have Skaggs sign the statement. At that time, Skaggs met with Alexander. Skaggs advised Alexander that police had agreed to recommend a life sentence if Skaggs told the truth and pled guilty to the charges. After examining the statement, Alexander advised Skaggs not to sign the statement unless the agreement to recommend a life sentence was mentioned therein. The police did not respond to Alexander's suggestion and Skaggs did not sign the statement.

9. This statement was not introduced at trial.

## A. *Voluntariness*

■ A defendant's due process rights under the Fourteenth Amendment are implicated where a confession is alleged to be involuntary because of some element of police coercion. *United States v. Rigsby,* 943 F.2d 631, 635 (6th Cir.1991) (citing *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)), *cert. denied,* 503 U.S. 908, 112 S.Ct. 1269, 117 L.Ed.2d 496 (1992); *see also Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) ("[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment.").

■ To evaluate the voluntariness of a confession, the Court must examine the "totality of the circumstances" surrounding the confession. *Rigsby,* 943 F.2d at 635. A voluntary confession results from "an essentially free and unconstrained choice by its maker," and is not the product of a will "overborne." *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). In considering the totality of the circumstances, the Court must consider "the characteristics of the accused and the details of the interrogation, and determine[ ] their psychological impact on an accused's ability to resist pressures to confess." *Rigsby,* 943 F.2d at 635 (quoting *United States v. Brown,* 557 F.2d 541, 546 (6th Cir.1977)). In this regard, the Sixth Circuit has set forth three prerequisites to finding that a confession is coerced. *Id.* First, the evidence must establish that the police activity was objectively coercive; second, the coercion must be sufficient to overbear the defendant's will; and, third, the defendant's will, in fact, must have been overborne as a result of the coercive police activity. *Id.* Although state court factual findings on this issue are entitled to a presumption of correctness if fairly supported by the record, resolution of the ultimate issue of voluntariness is subject to *de novo* review. *Miller* 474 U.S. at 110–11, 106 S.Ct. 445.

Skaggs maintains that his confessions were involuntary because they were induced by threats of the electric chair, by appeal to his religious devotion and by promises of a life sentence. Regarding the promises of a life sentence, the state court found and the record fairly supports that the Kentucky police did not promise Skaggs that they would or had the authority to recommend a life sentence. This finding, therefore, is controlling. *See Wainwright v. Goode,* 464 U.S. 78, 85, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983) (where state court findings have support in the record, those findings must control even though the federal habeas court may be inclined to render other findings which also have support in the record).

■ Regarding the coercive effect of the officer's alleged appeal to Skaggs' religious sensibilities during the trip back to Kentucky, the Court finds insufficient evidence to conclude the religious discussion rendered Skaggs' subsequent confession involuntary. At the November 20, 1981 suppression hearing, Skaggs testified concerning the religious conversation on the trip:

Q. On the way back to Kentucky did you have any conversation with either Detective O'Dell or Harlow?

A. I didn't what you say speak to either one of them for any certain, you know, long period of time. I think we just discussed several different things just by talking more or less about the highways and things, you know, atmosphere around. Of course Detective O'Dell and I got off on the subject of something about the bible. We got to talking about God and this and that. Other than that, that is about all I mentioned. I asked him something about who I would need for an attorney. He said "David, in your case you won't even need a lawyer." He said "all you'll have to do is go to court and plead guilty, get your life sentence and go on to prison." I said

"yes, I hate to go to the penitentiary for something I didn't do." I said "I'm going to go ahead and go on with it." I said "I don't want to." He said "David, it is best just to go ahead and get it off of your chest" and I said "Yes, I know." So I forgot about it.

Q. How long did you all talk about the bible?

A. Wasn't very long.

Q. Anything specifically that you remember about the conversation you had with Detective O'Dell?

A. Only that he helped me a lot. He told me that God was going my way, which was true.

Q. What else did he say, if you remember?

A. I don't remember, to be exact.

TE II at 189–90. This simply is insufficient evidence for the Court to conclude that the religious speech was objectively coercive, that it was sufficient to overbear Skaggs' will, or that it did, in fact, do so. Moreover, although there is evidence, albeit disputed, that Skaggs suffers mild mental impairment, Skaggs was thirty years old at the time of the crimes and no stranger to the law. At all times relevant, Skaggs was fully apprised of his rights. Notably, the length of time between the religious conversation on May 15 and Skaggs' subsequent confession on May 18 obviates against finding that the religious conversation had any appreciable effect on Skaggs' subsequent decision to confess to the crimes. Although Skaggs maintains that the religious colloquy was reminiscent of *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the Supreme Court decided *Brewer* on Sixth Amendment grounds. Moreover, the speech in *Brewer* bears little resemblance to the religious "discussion" described by Skaggs at the suppression hearing.[10]

---

10. In *Brewer,* 430 U.S. at 392–93, 97 S.Ct. 1232, the detective transporting the prisoner delivered what is known as the "Christian burial speech." Addressing the prisoner as "Reverend," the detective said:

I want to give you something to think about while we're traveling down the road.... Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening. They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you

Finally, Skaggs alleges that his first confession was involuntary because police threatened him with the electric chair and told him that the residents of Barren County (where the homicides occurred) were just waiting for him to be returned. Upon reviewing the totality of circumstances surrounding the first confession, the Court cannot conclude that the alleged threats would have been sufficient to render Skaggs' statements involuntary. First, Skaggs had extensive experience with the criminal justice system and was probably well aware of the possible consequences of a murder conviction.[11] Moreover, any such threats would likely have coercive effect only if coupled with the promise of leniency. As previously noted, the state court found and the record fairly supports that the police did not offer Skaggs a deal. Finally, assuming arguendo that the alleged threats *were* sufficient to render Skaggs' first confession involuntary, the Court would find introduction of the first confession harmless error where the inculpatory portions of the first confession were repeated in Skaggs' May 18 confession.

## B. *Fifth Amendment Right Against Self-Incrimination*

Skaggs also maintains that he involuntarily waived his Fifth Amendment right against self-incrimination during custodial interrogations on May 14 and May 18, 1981. Skaggs maintains that his waivers were involuntary because they were the product of misrepresentation and coercive police inducement. Specifically, Skaggs argues that the interrogating officers' promises of leniency and appeal to his religious sensibilities rendered his Fifth Amendment waivers involuntary. The question of whether Skaggs voluntarily waived his Fifth Amendment rights is a mixed question of law and fact subject to *de novo* review. *Williams v. Clarke*, 40 F.3d 1529, 1543 (8th Cir.1994), *cert. denied*, 514

U.S. 1033, 115 S.Ct. 1397, 131 L.Ed.2d 247 (1995). However, state court findings of fact on this issue are entitled to a presumption of correctness if fairly supported by the record. *Id.*

The Fifth Amendment of the United States Constitution protects against compulsory self-incrimination. The privilege against self-incrimination "is fully applicable during a period of custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 460–61, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* states that incriminating statements obtained during custodial interrogation are not admissible unless the suspect validly waives his Fifth Amendment privilege before making the statements. *Id.* at 475, 86 S.Ct. 1602. The standard for reviewing the voluntariness of an asserted *Miranda* waiver is essentially the same as that for reviewing the voluntariness of a confession. *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with full knowledge of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances' surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Id.*

As previously noted, the state court found and the record fairly supports that the interrogating officers did not promise Skaggs they would, or had authority to, recommend a life sentence. Therefore, the Court limits its consideration to whether the officers' appeal to Skaggs' religious sensibilities was so

---

yourself may be unable to find it. And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them of Christmas [E]ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying

to come back out after a snow storm and possibly not being able to find it at all.

11. The Indictment, *see* TR I at 9, indicates that Skaggs had two prior convictions for first degree robbery in addition to prior convictions for second degree escape, entering to commit a felony and auto banditry.

coercive in nature as to nullify Skaggs' waiver of his right against self-incrimination.

First, the May 15 religious discussion could not possibly have affected the voluntariness of Skaggs' May 14 waiver. In addition, the lapse of three days between the May 15 discussion and Skaggs' waiver on May 18 also obviates against finding that the religious discussion had any effect on that confession. Moreover, Skaggs' familiarity with the criminal justice system supports that he fully understood that the statements he chose to make could, and most likely would, be used against him. Skaggs was well aware of his right to remain silent and the consequences that might result from his decision not to do so.

### C. *Fifth Amendment Right to Counsel*

Skaggs next argues that the state court should have suppressed his confessions because they were obtained in violation of his Fifth Amendment right to counsel under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Skaggs asserts that he had two attorneys: one in Indiana, where he was initially interrogated, and one in Kentucky.

■ In *Edwards*, the Supreme Court held that after an accused "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation ... unless the accused himself initiates further communication, exchanges and conversations with the police." *Id.* at 484–85, 101 S.Ct. 1880. Unlike the Sixth Amendment right to counsel, however, the *Edwards* rule is not offense-specific: "once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present." *McNeil v. Wisconsin*, 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (Emphasis in original). Additionally, the Sixth Circuit recently held that the broad sweep of the *Edwards* rule does not apply to suspects who are not in *continuous* custody. *Kyger v. Carlton*, 146

F.3d 374, 380 (6th Cir.1998); *see also United States v. Barlow*, 41 F.3d 935, 945–46 (5th Cir.1994), *cert. denied*, 514 U.S. 1030, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995); *United States v. Hines*, 963 F.2d 255, 257 (9th Cir. 1992); *Dunkins v. Thigpen*, 854 F.2d 394, 397 (11th Cir.1988), *cert. denied*, 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); *McFadden v. Garraghty*, 820 F.2d 654, 661 (4th Cir.1987); *United States ex. rel. Espinoza v. Fairman*, 813 F.2d 117, 125 (7th Cir.), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 745 (1987); *see also McNeil*, 501 U.S. at 177, 111 S.Ct. 2204 ("If the police do subsequently initiate an encounter in the absence of counsel (*assuming there has been no break in custody* ), the suspect's statements are presumed involuntary....") (Emphasis added).

■ Skaggs first maintains his May 14 confession was obtained in derogation of an existing attorney-client relationship. Skaggs notes that the police were well aware that he had counsel representing him in Indiana on other pending charges, but that the police chose to interrogate him about the murders without counsel present.

This argument is fatally flawed. First, the state court found and the record fairly supports that, at all times relevant, Skaggs was informed of his *Miranda* rights, but that Skaggs consistently refused the assistance of counsel. There simply is no evidence that Skaggs ever invoked his *Miranda* right to counsel.[12]

■ Skaggs also maintains that his May 18 confession was obtained in deprivation of his Fifth Amendment right to counsel. This argument also is without merit. Again, the state court found and the record fairly supports that Skaggs never invoked his right to counsel despite repeated warnings. Moreover, an accused's invocation of his Sixth Amendment right to counsel during a judicial proceeding is not equivalent to the expression necessary to trigger the right to counsel

---

**12.** The record does indicate that, at the time Skaggs was initially interrogated, he was represented by Indiana counsel on other charges. However, Skaggs was out on bond on the pending charges. Therefore, assuming arguendo that

Skaggs did invoke his Sixth Amendment right to counsel with respect to the pending Indiana charges, Skaggs cannot show that he was in continuous custody at the time he was initially interrogated for the murders at issue.

pursuant to *Miranda.* *McNeil,* 501 U.S. at 178–79, 111 S.Ct. 2204.

### D. *Sixth Amendment Right to Counsel*

Skaggs next argues the state court should have suppressed his May 18 confession because it was obtained in violation of his Sixth Amendment right to counsel. The Sixth Amendment right to counsel attaches at the "initiation of adversary judicial proceedings." *Michigan v. Jackson,* 475 U.S. 625, 629, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (citing *United States v. Gouveia,* 467 U.S. 180, 187, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)). "[I]f police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Id.* at 636, 106 S.Ct. 1404.

In the present case, the facts support that the district court judge appointed Skaggs counsel at his arraignment and that Skaggs was subsequently interrogated by the police in the absence of counsel. However, the state court found and the record fairly supports that Skaggs never *invoked* his Sixth Amendment right to counsel; rather, the state court appointed counsel *sua sponte* following request by the county prosecutor. Skaggs basically argues that it was unnecessary for him to actually *invoke* his Sixth Amendment right to counsel for the rule of *Michigan v. Jackson* to apply. However, a review of Jackson and its progeny convinces the Court that invocation of the Sixth Amendment right to counsel is a necessary prerequisite to application of the rule. *See McNeil,* 501 U.S. at 179, 111 S.Ct. 2204 ("[*Michigan v. Jackson* held] that after the Sixth Amendment right to counsel *attaches and is invoked,* any statements obtained from the accused during subsequent police-initiated custodial questioning regarding the charge at issue (even if the accused purports to waive his rights) are inadmissible.") (Emphasis added); *see also Montoya v. Collins,* 955 F.2d 279, 282–83 (5th Cir.) ("The rule of *Jackson* is invoked by the defendant's assertion ... of the right to counsel.... [A]n 'assertion' means some kind of positive statement or other action that informs a reason-able person of the defendant's 'desire to deal with the police only through counsel.' "), *cert. denied,* 506 U.S. 1036, 113 S.Ct. 820, 121 L.Ed.2d 692 (1992); *but see Stokes v. Singletary,* 952 F.2d 1567, 1579 (11th Cir.1992) (finding parties' dispute concerning defendant's request for counsel immaterial to issue regarding Sixth Amendment right to counsel where defendant was appointed counsel at arraignment). Moreover, a review of the record and state court findings convinces the Court that Skaggs "knowingly and voluntarily" waived his Sixth Amendment right to counsel prior to the May 18 interrogation and resulting confession. *See Patterson v. Illinois,* 487 U.S. 285, 296, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) ("As a general matter ... an accused who is admonished with the warnings prescribed by this Court in [*Miranda* ], has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.") (Internal citation omitted).

### VI.

### *The Trial Court Unfairly Limited the Questions Asked By the Defense During Voir Dire*

Skaggs argues that during the first trial the court improperly limited defense questions concerning whether prospective jurors would consider an insanity defense. The trial court conducts voir dire examination of prospective jurors in order to protect the defendant's constitutional right to an impartial jury and a fair trial.

In *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Court affirmed the significance of adequate voir dire upon the defendant's constitutional right to a fair trial:

> [P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. 'Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove pro-

spective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.' Hence, '[t]he exercise [of the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness.'

*Id.* at 729–30, 112 S.Ct. 2222 (Internal citations omitted).

■ Moreover, the *Morgan* Court further emphasized that "[a]ny juror to whom mitigating factors are … irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial." *Id.* at 739, 112 S.Ct. 2222. In this regard, courts have recognized that defendants have the right to have prospective jurors questioned about their ability to objectively and fairly evaluate evidence of insanity or mental capacity. *United States v. Birdsell,* 775 F.2d 645, 652 (5th Cir.1985), *cert. denied,* 476 U.S. 1119, 106 S.Ct. 1979, 90 L.Ed.2d 662 (1986); *United States v. Allsup,* 566 F.2d 68, 70 (9th Cir.1977). However, the trial judge may limit questioning of jurors without necessarily prejudicing the defendant's constitutional right to a fair and impartial jury.

> [T]he 'determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge.' Thus, the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant.

*Ristaino v. Ross,* 424 U.S. 589, 594–95, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976).

In the present case, the trial court allowed defense counsel opportunity to voir dire prospective jurors regarding possible bias concerning the insanity defense. Skaggs' allegation of improper limitation on voir dire is based on the trial court's decision to sustain an objection to the following query by defense counsel:

How many of you, after hearing the evidence, if you believe that David committed the crime, but that he was legally insane at the time, how many of you could return a verdict of not guilty by reason of insanity?

TE IV at 511. However, the transcript shows that following the objection defense counsel rephrased the question:

> Are there any of you who believe a person should be punished by imprisonment or death for a crime that was committed at a period during which he was insane or mentally ill?

*Id.* at 511–512. The transcript indicates there was no response to this question. Moreover, a review of the relevant portions of the transcript gives no indication that the trial court otherwise limited the scope of voir dire on this issue or that the trial court's comments intimidated prospective jurors into silence. Thus, the Court finds insufficient basis to conclude that the trial court unfairly limited defense counsel's efforts to voir dire prospective jurors concerning their possible bias toward the insanity defense.

■ Skaggs also alleges that the court improperly limited the scope of voir dire at the retrial of the penalty phase. Skaggs argues that the trial court should have compelled jurors who had formed an opinion as to the appropriate penalty to disclose that opinion so that Skaggs could determine juror bias. Skaggs maintains that the trial court's failure to compel Jurors Wells and Jones to reveal any preformed opinions violated Skaggs' due process right to exercise his peremptory challenges as established by Kentucky procedural law.

■ Initially, the Court agrees with Petitioner that the state cannot limit voir dire to the extent that it is impossible to establish the basis of a challenge for cause. *See Morgan v. Illinois,* 504 U.S. at 733–34, 112 S.Ct. 2222. However, a review of the transcript indicates that the trial court fully and fairly allowed defense counsel to question Juror Wells regarding the possibility that he had any preformed opinion about the appropriateness of the death penalty.[13] Following

13. In *Morgan,* 504 U.S. at 734 n. 7, 112 S.Ct. 2222, the Supreme Court quoted with approval the following passage from *Smith v. Balkcom,* 660 F.2d 573, 578 (5th Cir.1981) (emphasis in original), *modified,* 671 F.2d 858, *cert. denied,*

initial voir dire of Wells, the trial court recalled Wells in response to a misunderstanding regarding his testimony. The trial court then questioned Wells a second time regarding his ability to disregard anything he may have heard about the case in the papers and to follow the court's instructions regarding all possible penalties. Following Well's affirmative response to this question, defense counsel indicated to the court that he had no further questions for Wells. The Court finds no indication that the trial court limited the voir dire of prospective juror Wells or that Wells had any preformed opinions concerning the appropriate penalty that would prevent him from following the court's instructions on this matter.

Likewise, the transcript indicates that the trial court allowed defense counsel full and fair opportunity to voir dire Juror Jones regarding any preformed opinions she may have had concerning the appropriateness of the death penalty. In addition, the transcript indicates no basis to conclude that Jones had any preformed opinions regarding the appropriateness of the death penalty that would have prevented her from following the court's instructions and justified her dismissal for cause. In light of these findings, the Court need not address whether the trial court arbitrarily deprived Skaggs his due process right to exercise his peremptory challenges in accordance with state procedural law.[14] *See Ross v. Oklahoma*, 487 U.S. 81, 88–91, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *Thomas v. Commonwealth*, Ky., 864 S.W.2d 252, 259–60 (1993).

## VII.

*The Trial Court Deprived Skaggs of a Fair Trial By Refusing to Grant a Change of Venue for the Guilt Phase of the Trial*

Skaggs also alleges that he was deprived of his constitutional right to a fair trial when the trial judge refused to grant a change of venue in the face of extensive pretrial publicity. Skaggs refers the Court to numerous allegedly prejudicial and inflammatory reports contained in newspaper articles and radio and TV broadcasts prior to his first trial. Skaggs also refers the Court to the results of a phone survey of community opinion conducted prior to the trial. The survey results, Skaggs maintains, indicate that pretrial publicity caused "universal exposure and significant levels of prejudgment." Skaggs argues that this adverse publicity biased jurors to such an extent that a change of venue was necessary to assure his constitutional right to a fair trial. Skaggs also points out that all of the jurors at his first trial indicated in group voir dire that they had heard of the case.

Prior to the initial trial, the trial court conducted an evidentiary hearing in response to Skaggs' motion for a change of venue. In his Order denying Skaggs' motion, the trial judge made the following findings regarding the phone survey of community opinion:

> The only thing Dr. Nietzel claims is that the survey is a fair representation of the opinions of jury-eligible citizens of Barren and Warren Counties, plus or minus 5%. The Court finds the poll, or survey, very interesting and has no intentions to question its reliability, but does hold that it falls far short of supporting the contention that [Skaggs] cannot obtain a fair trial in Barren County. In fact, the results of the survey strongly indicate that [Skaggs] can obtain a fair trial in Barren County.

TR IV at 478. The trial court also addressed Skaggs' contention that pretrial media coverage was so prejudicial and inflammatory as to deny him his right to a fair trial and an impartial jury.

> An examination of the material filed on the question of publicity, speaks for inself [sic]. Such clippings from the press and radio

459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982):

> All veniremen are potentially biased. The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to *either* side of the case. Clearly, the extremes must be eliminated—i.e. those who, in spite of the evidence, would automatically vote to convict or impose the death penalty, or automatically vote to acquit or impose a life sentence.

**14.** The Court does wish to note, however, that the Commonwealth, not Skaggs, exercised one of its peremptory challenges to remove Jones from the jury panel.

scripts contain nothing which would tend to inflame and so prejudice the minds of prosective [sic] jurors, generally, that would make it unlikely, much less impossible, to select a jury that would fail to give [Skaggs] a fair trial based on the evidence at trial. In fact, considering the nature of the case, the media has acted with responsible restraint. It is noted that subsequent to the return of the indictment, approximately 7 months ago, there has been no publicity about the case of any significance.

*Id.*

The Kentucky Supreme Court reviewed this issue on direct appeal, also considering actual juror voir dire prior to trial and whether it evidenced any juror bias. In pertinent part, the Kentucky Supreme Court noted:

A careful review of the media coverage, the general and specific voir dire indicates that under all the circumstances, the jury actually seated at the guilt phase of the trial was impartial.

&ast; &ast; &ast; &ast; &ast; &ast;

None of the jurors indicated that their exposure to any publicity had adversely affected their ability to decide the case on the evidence alone. There was no community atmosphere so prejudicial that the jurors could be considered less than impartial. A careful review of the allegations presented by Skaggs indicates that there is no considerable probability of the accused being unable to obtain a fair and impartial trial in the county in which he was tried.

*Skaggs,* 694 S.W.2d at 677.

■ Skaggs concedes that juror impartiality is reviewed under the "presumption of correctness" accorded state court factual findings pursuant to 28 U.S.C. § 2254(d). However, Skaggs maintains the trial judge's ruling that "there is no evidence that pretrial publicity created a pattern of bitter prejudice against [Skaggs]" was clear error and not fairly supported by the record. Therefore, Skaggs argues, the state court findings are not entitled to the statutory presumption.

The Court disagrees. Having reviewed the record, the Court finds that it fairly supports the state court's factual findings. Almost all of the pretrial publicity was limited to the period immediately following the murders, Skaggs' arrest and his indictment by the grand jury. Furthermore, almost all of the media coverage was factual in nature. The record indicates that from July, 1981 until the latter part of February, 1982,[15] there was no media coverage concerning Skaggs or his alleged crimes. This extended period during which there was no media publicity served to ameliorate the prejudicial effect of what little potentially inflammatory publicity was contained in media reports immediately following the killings and Skaggs' arrest.

■ Moreover, the fact that jurors were familiar with Skaggs' name and his alleged crimes is not, in itself, indicative of an atmosphere poisoned and inflamed by bias of constitutional proportion. Due process does not require that jurors be totally unaware of the facts involved. In *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court stated:

It is not required ... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*See also Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (stating that "juror exposure to information

**15.** Jury selection in the guilt phase of Skaggs' trial began on February 23, 1982.

about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone [does not] presumptively deprive[ ] the defendant of due process."); *Deel v. Jago,* 967 F.2d 1079, 1088 (6th Cir. 1992) (although transcript of voir dire indicates jurors were familiar with the crime, no indication that jurors harbored any preconceptions about the defendant's guilt). In the absence of inflammatory or prejudicial pretrial publicity or demonstrable juror bias, the trial court did not commit constitutional error by denying Skaggs' motion for a change of venue.

## VIII.

### *The Trial Court Deprived Skaggs of a Fair Trial By Refusing to Grant Skaggs' Request for a Change of Venue for the Retrial of the Penalty Phase*

■ Skaggs next alleges he was deprived of his constitutional right to a fair trial when the trial judge refused to grant a change of venue for the retrial of the penalty phase. Skaggs maintains extensive prejudicial media publicity following the jury's deadlock in the first trial is indicative of unabated public interest in the case. Moreover, Skaggs argues, the publicity was particularly prejudicial to the extent that it dealt with the reasons for the jury's deadlock, which purportedly was the possibility that Skaggs would be paroled under any sentence less than death. Skaggs maintains this publicity impermissibly heightened community awareness of parole as a factor in sentencing. Skaggs cites as particularly prejudicial a March 7, 1982 Bowling Green Daily News article in which the Commonwealth Attorney was quoted as saying:

> With a life sentence, Skaggs could be paroled in eight years. But even if he were never executed, he would be in prison without parole if he were sentenced to the death penalty.

Petitioner's Reply Brief, Exhibit E. Skaggs notes that under Kentucky law jurors are not allowed to consider the possibility of parole in determining whether a defendant should receive the death penalty. *See Perdue v. Commonwealth,* 916 S.W.2d 148, 163 (Ky. 1995) (noting that state statute prohibits in-

troduction of evidence concerning minimum parole eligibility guidelines when death penalty is sought), *cert. denied,* —— U.S. ——, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996). Skaggs maintains that the prosecution's dissemination of inadmissible evidence substantially prejudiced his right to a fair trial. *See Sheppard v. Maxwell,* 384 U.S. 333, 360, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) ("The prosecution repeatedly made evidence available to the news media which was never offered in the trial. Much of the 'evidence' disseminated in this fashion was clearly inadmissible. The exclusion of such evidence in court is rendered meaningless when news media make it available to the public.").

■ Initially, the Court rejects that media reference to Skaggs' eligibility for parole prejudiced potential jurors to such an extent that a change of venue was necessary to ensure Skaggs' right to a fair trial. It is not the province of the Court on habeas review to ensure that the proceedings surrounding Skaggs' sentencing comport with Kentucky law, only to ensure that the proceedings pass muster under the federal Constitution. Since federal constitutional law does not prohibit capital sentencing juries from considering the possibility of parole or commutation of sentence, *see generally California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), any publicity on this subject did not prejudice Skaggs' right to a fair trial under the federal Constitution.

The Court also rejects that, generally speaking, publicity prior to retrial of the penalty phase was so prejudicial and inflammatory as to compromise Skaggs' right to a fair trial. The trial court considered, but summarily rejected, Skaggs' motion for a change of venue prior to retrial of the penalty phase. On direct appeal, the Kentucky Supreme Court sustained the trial court's decision and made the following findings:

> Of the twelve jurors who returned the death penalty, four stated during individual voir dire that they had seen or heard no publicity about the case. Six others said that although they had been exposed to some publicity, they had not formed an opinion based on that fact. Juror Baxter

stated that she could set aside information received outside the proceedings and render a decision based solely on the evidence. Although juror Vance was not asked any particular questions during the individual voir dire concerning publicity, she was present and did not respond to trial judge's questions concerning publicity directed to the entire panel.

The records shows that the trial judge excused several members of the panel either because they had formed an opinion or because of undue exposure to the prior proceedings

\* \* \* \* \* \*

Out of the 43 veniremen called, 15 were excused for cause, including 3 on the death penalty issue, and 15 were struck by peremptory challenges of the parties. There was not the existence of such community prejudice as would prevent the selection of a proper jury.... The influence of the media did not pervade the proceedings.

*Skaggs*, 694 S.W.2d at 676–77. ·

As noted in the previous argument, juror impartiality is reviewed under the "presumption of correctness" accorded state court factual findings pursuant to 28 U.S.C. § 2254(d). The Court has reviewed the record and finds that it fairly supports the above-quoted findings made by the Kentucky Supreme Court. Almost all of the publicity preceding the retrial was factual in nature. Moreover, the record indicates there was essentially no publicity about Skaggs or his crime during the period between the first penalty phase trial and the penalty phase retrial—a period spanning almost 3½ months. Again, the effect of the few potentially inflammatory statements disseminated by the media following the first trial was likely tempered by the passage of time. Consequently, Skaggs' contention that the trial court committed constitutional error by denying his motion for a change of venue for the penalty phase retrial is without merit.

## IX.

### *The Trial Court Deprived Skaggs His Constitutional Right to a Fair Trial by Denying Skaggs' Motion for Individual Voir Dire Regarding Juror Exposure to Publicity*

■ Skaggs next alleges constitutional error in the denial of his motion to individually voir dire each venire person, outside the presence of the jury panel, concerning his or her exposure to pretrial publicity. Prior to the initial trial, Skaggs' counsel requested to individually voir dire members of the jury panel concerning the extent of their exposure to pretrial publicity. Skaggs argued that it was impossible to question jurors as a group about their knowledge of the case because of the overwhelming danger that one juror's answers would infect the entire panel. Although the trial judge allowed Skaggs' counsel to individually voir dire panel members concerning their attitudes regarding the death penalty, the trial judge denied Skaggs' motion to individually voir dire panel members concerning their exposure to pretrial publicity.[16] Skaggs maintains that he was entitled to individual voir dire on this issue because pretrial publicity was overwhelming and he was on trial for his life. In particular, Skaggs objects that he was not able to individually voir dire panel members regarding their exposure to publicity containing facts held inadmissible at trial—for instance, the fact that Skaggs had previously been convicted of several felonies and the fact that he was suspected of another murder in Columbus, Indiana.

However, as noted by Respondent, the Supreme Court has rejected the argument that the Constitution requires individual voir dire of each prospective juror regarding the content of pretrial publicity to which the juror was exposed. *Mu'Min v. Virginia*, 500 U.S. 415, 424–432, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).

'[T]he relevant question is not whether the community remember[s] the case, but whether the jurors ... [have] such fixed opinions that they could not judge impar-

---

**16.** At the retrial of the penalty phase, the trial court did allow individual voir dire of jury panel

members regarding exposure to pretrial publicity and possible bias.

tially the guilt of the defendant.' Under this constitutional standard, answers to questions about content alone, which reveal that a juror remembered facts about the case, would not be sufficient to disqualify a juror. 'It is not required ... that the jurors be totally ignorant of the facts and issues involved.

*Id.* at 430, 111 S.Ct. 1899 [Internal citations omitted].

As previously mentioned, the entire jury panel indicated some familiarity with Skaggs and his alleged crime. However, each panel member not removed for cause indicated he or she could fairly and impartially judge Skaggs based on the evidence presented at trial. Moreover, although the trial judge was well aware of the pretrial publicity to which potential jurors were exposed, he determined that it was not so pervasive and inflammatory as to jeopardize Skaggs' right to a fair trial. As previously discussed, *see supra* section VII, the Court has reviewed the pretrial publicity contained in the record and finds that it was not so widespread or explosive as to deny Skaggs his right to a fair trial. In addition, after carefully reviewing that portion of the record containing juror voir dire, the Court also addressed and rejected Skaggs' argument regarding juror bias. Under these circumstances, the trial court did not commit constitutional error by refusing Skaggs' motion to individually voir dire the jury panel regarding exposure to pretrial publicity.

## X.

***Skaggs' Sixth, Eighth and Fourteenth Amendment Rights Were Violated Because the Penalty Phase Verdict Form Made It Appear as if the Jury Should Sentence Skaggs to Death Upon the Finding of Any Aggravating Circumstance***

The issue here is whether Skaggs' constitutional rights were violated by an allegedly infirm verdict form which Skaggs maintains did not allow the jury to recommend any sentence other than death once the jury found one of the statutory aggravating circumstances. Skaggs argues that the problem with the verdict form was exacerbated by the trial court's refusal to instruct the jury that it could return a sentence less than death even if it found aggravating circumstance(s). Moreover, Skaggs asserts, the trial court's failure to give this instruction "very well could have resulted in a failure to fully consider mitigating factors and led to an erroneous or improperly based recommendation of the death penalty."

To warrant federal habeas relief as a result of an incorrect jury instruction, a petitioner must show more than that the instruction was "undesirable, erroneous, or even 'universally condemned,' but that it violated [some constitutional right]." *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Donnelly v. De-Christoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). The proper standard is whether there is a *"reasonable likelihood* that the jury has applied the challenged instruction in a way that prevents consideration of constitutionally relevant evidence." [17] *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) [Emphasis added]. Moreover, the focus is on the *reasonable likelihood* that the *entire* jury applied the instruction in an improper manner. *Id.* In addition, the instruction " 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)).

Acknowledging that it violates the Constitution to preclude a death penalty jury from considering relevant mitigating evidence, *see id.* at 382, 110 S.Ct. 1190, the Court finds no "reasonable likelihood" that the *entire* jury considering Skaggs' fate

---

**17.** The Supreme Court has applied the same "reasonable likelihood" standard in determining whether a jury instruction violates a defendant's right to due process, *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), and in considering whether an instruction violates a defendant's Eighth Amendment right requiring that a jury be able to consider and give effect to all relevant mitigating evidence, *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

failed to consider the mitigating evidence presented. The instructions, when viewed as a whole, and the trial record do not support such a finding.

The trial court did not limit Skaggs' presentation of mitigating evidence during the penalty phase retrial. Furthermore, the trial court instructed the jury that, in determining a penalty, the jury "shall" consider the mitigating circumstances set forth in the instructions, plus "any other fact or circumstance" which the jury might consider mitigating. The trial court similarly mandated the jury to consider certain statutory aggravating factors in fixing Skaggs' penalty. The jury was instructed:

> You have now heard the evidence in the case from which you shall determine whether there are mitigating or aggravating facts and circumstances bearing upon the question of punishment.

TR VIII at 1162, 1169. The jury was also instructed that:

> If upon the *whole case* you have a reasonable doubt whether the defendant should be sentenced to death, you shall recommend a sentence of imprisonment instead. [Emphasis added]

*Id.* at 1166, 1173. Finally, the trial record indicates that both the prosecution and defense informed the jury in their closing arguments that the jury was not *required* to impose the death penalty upon finding aggravating circumstances. In light of the foregoing, the Court cannot conclude there is a reasonable likelihood the entire jury was under the impression that, upon finding an aggravating circumstance, it was precluded from considering mitigating evidence because a sentence of death was mandated.

## XI.

*Skaggs' Rights Under the Sixth, Eighth, and Fourteenth Amendments Were Violated When He Was Denied Access to Data Utilized by the Kentucky Supreme Court When Reviewing His Death Sentence on Appeal*

■ Skaggs next alleges his federal constitutional rights were violated when the Kentucky Supreme Court used "secret" information while conducting a proportionality review of his death sentence. In this regard, Skaggs notes that the Kentucky Supreme Court is mandated by statute to review each case in which the death penalty is imposed, considering the punishment as well as any alleged errors. *See* KRS 532.075(1), (2). With regard to the sentence, KRS 532.075(3) mandates that the court consider whether the sentence of death was imposed under the influence of passion or any other arbitrary factor, whether the evidence supports the jury's or judge's finding of statutory aggravating circumstances, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. To assist in making this determination, the court is effectively authorized pursuant to KRS 532.075(6) to collect the following: (1) records of all felony offenses in which the death penalty was imposed after January 1, 1970; (2) with respect to those records, a synopsis or brief of the facts concerning the crime and the defendant; and (3) *"such data as are deemed by the Chief Justice to be appropriate and relevant to the statutory questions concerning the validity of the sentence."* [Emphasis added]

On direct appeal, Skaggs argued before the Kentucky Supreme Court that Kentucky's death penalty statute operates in an arbitrary, discriminatory and freakish manner. Skaggs also asserted that he needed access to the data collected by the Court pursuant to KRS 532.075(6). The Kentucky Supreme Court rejected Skaggs' argument on this issue. Here, Skaggs maintains that by denying him access to information not contained in the record, the state appellate court effectively denied him the opportunity to challenge the information used or to assert that the information did not support application of the death penalty.

To support this argument, Skaggs relies primarily on *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), where the Supreme Court vacated and remanded a death sentence upon evidence that, despite a jury recommendation that the defendant receive a life sentence, the trial judge sentenced the defendant to death. In deciding to impose a penalty of death, the

trial judge relied in part on confidential information contained in a pre-sentence investigation report. *Id.* at 353, 97 S.Ct. 1197. On review, the Supreme Court held that the defendant "was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which [the defendant] had no opportunity to deny or explain." *Id.* at 362, 97 S.Ct. 1197.

■ Initially, the Court notes that, shortly before considering Skaggs' direct appeal, the Kentucky Supreme Court had occasion to more fully address this same argument.

> For some reason, obscure to us, the Public Advocate keeps insisting on access to the data collected by this Court under the provisions of KRS 532.075(6).... KRS 532.075(6) refers to all records of all felony cases in which the death penalty was imposed after January 1, 1970, or such earlier date as the court may deem appropriate. We have used such cases commencing in 1972. The Public Advocate can study these cases, as we have done. We state in our opinions all matters considered by us, and in no way are mysterious and secret records or data taken into account in our deliberations. [Emphasis deleted]

*Harper v. Commonwealth,* 694 S.W.2d 665, 670–71 (Ky.1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). Moreover, the Supreme Court's holding in *Gardner* is inapposite under the present circumstances. Notably, the Constitution does not require proportionality review. *Pulley v. Harris,* 465 U.S. 37, 50, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Furthermore, as noted in *Kordenbrock v. Scroggy,* 680 F.Supp. 867 (E.D.Ky.1988), *rev'd on other grounds,* 919 F.2d 1091 (6th Cir.1990) (en banc), "where such a review is required by state law, ... federal due process [does not] require that state courts 'make an explicit, detailed account of their comparison.'" *Id.* at 899 (quoting *Lindsey v. Smith,* 820 F.2d 1137, 1154 (11th Cir.1987), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989).

> Based on their own past experience in reviewing capital punishment cases, state appellate courts 'can rationally distinguish between those individuals for whom the death penalty is an appropriate sanction and those for whom it is not,' without listing in their opinions the facts that did or did not justify the imposition of the death penalty in prior cases. [Internal citations omitted]

*Id.* In light of the foregoing, the Court rejects Skaggs' contentions on this issue.

## XII.

### *Skaggs Was Denied Due Process of Law by the Improper Introduction of Collateral Criminal Activity at the Guilt–Innocence Phase of the Trial*

Skaggs next alleges constitutional error in the admission of certain evidence regarding collateral criminal activity. Specifically, Skaggs objects to testimony that he 1) sold drugs illegally; 2) had previously "pulled time" in prison; 3) was on a police-generated list of persons with the alleged propensity to commit robbery; and 4) had stolen the gun allegedly used to commit the murders. Skaggs maintains that admission of this evidence violated his due process right to a fair trial. Skaggs acknowledges that, pursuant to Fed.R.Evid. 404(b), evidence of other crimes may be admissible for the limited purpose of showing motive, intent, knowledge, identity or common scheme or plan, but argues that none of these exceptions are applicable to the allegedly prejudicial evidence admitted by the state court. Skaggs notes that although the majority opinion of the Supreme Court of Kentucky did not address this issue directly, the sole dissenting opinion contended that the repeated references to collateral criminal activity was error. *See Skaggs v. Commonwealth,* 694 S.W.2d 672, 683 (Ky.1985) (Leibson, J., dissenting).

■ Errors by a state court in the admission of evidence generally are not reviewable by a habeas court "unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial. *Kelly v. Withrow,* 25 F.3d 363, 370 (6th Cir.), *cert. denied,* 513 U.S. 1061, 115 S.Ct. 674, 130 L.Ed.2d 607 (1994). To determine whether the admission of certain evidence violated the defendant's constitutional right to a fair trial, the habeas

court must first determine whether the evidence is relevant or probative of an issue on which the prosecution bears the burden of proof. *Estelle v. McGuire,* 502 U.S. 62, 69–70, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Evidence is relevant if it makes the existence of any fact of consequence to the action more or less likely. Fed.R.Evid. 401. If the court determines that the objectionable evidence is relevant to an essential element in the state's case, the court can conclude *a fortiori* that the defendant's due process rights were not violated by admission of the evidence. *Id.* at 70, 112 S.Ct. 475. However, if the evidence is not relevant to an issue in the case, the court must determine whether admission of the evidence violated the defendant's right to a fair trial. *Id.* Habeas relief is warranted only if the court determines that the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). To ascertain the effect of the error on the defendant's due process right, the habeas court reviews the trial transcript to determine not whether the jurors were

> right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.
>
> This must take into account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason, This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record. [Internal citations omitted]

*Id.* at 764, 66 S.Ct. 1239.

Under the Kentucky Rules of Evidence, evidence of other crimes, wrongs or acts, though not admissible to prove bad character or propensity to crime, can be admitted (1) if offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, or (2) if so inextricably intertwined with other evidence essential to the case that separation of the two could not be accomplished without serious adverse effect on the offering party. KRE 404(b). Essentially, KRE 404(b) mirrors the Federal Rules of Evidence regarding the admissibility of "other acts" evidence. *See* Fed.R.Evid. 404(b) (allowing evidence of other crimes, wrongs or acts to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"); *United States v. Chandler,* 996 F.2d 1073, 1101 (11th Cir.1993) ("Rule 404 does not proscribe evidence of criminal activity other than the charged offense if it arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of trial.") [Internal quotation omitted].

The Commonwealth of Kentucky charged Skaggs with intentional murder, first degree burglary and first degree robbery. To sustain its burden of proof on the charge of murder, the prosecution was required to prove beyond a reasonable doubt that Skaggs intentionally caused the death of Herman and Mae Matthews by shooting them with a pistol. *See* KRS 507.020. To prove Skaggs guilty of the charge of burglary in the first degree, the prosecution was required to prove that, with the intent to commit a crime, Skaggs knowingly and unlawfully entered the Matthews' residence and that in so doing he was armed with a pistol or caused physical injury to the Matthews. *See* KRS 511.020. On the charge of first degree robbery, the prosecution was required to prove that Skaggs stole a sum of money from the Matthews and that, in the course of so doing and with the intent to accomplish the theft, Skaggs used physical force upon the Matthews or was armed with a pistol. *See* KRS 515.020.

Initially, then, the Court must determine whether the alleged improperly admitted evidence of "other acts" was relevant to proving that Skaggs was guilty of the charged crimes

or whether the sole inference from the "other acts" evidence was to show Skaggs' bad character or propensity to commit the charged crimes. In the latter case, as previously mentioned, the Court may find that admission of the evidence violated Skaggs' constitutional right to a fair trial if the Court determines that the "other acts" evidence had "a substantial or injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239.

■ Skaggs first assigns constitutional error to testimony elicited from Gary Connally that on the morning of the murders Skaggs stated he was going to "go sell some dope." TE VI at 819. To determine the relevancy of this statement, it is necessary for the Court to examine the context in which it was made. Connally testified that he had known Skaggs for approximately one year and that on May 5, Skaggs had come to Connally's home and stayed the night. *Id.* at 815, 66 S.Ct. 1239. Connally testified that, on the morning of May 6, Skaggs had left alone at approximately 10:00 a.m. and had returned sometime between 6:00 and 6:30 p.m. *Id.* at 816, 66 S.Ct. 1239. Connally testified that upon return to Connally's house, Skaggs had given him $40. *Id.* at 818, 66 S.Ct. 1239. The testimony then proceeded as follows:

Q. Well, when he pulled [out the $40], did you see any other money?

A. Yes, sir, I did.

Q. And did it surprise you?

A. Well, no, not in a way, because he said he had a transaction to make that day earlier, which was none of my business. I didn't pry into it.

Q. Well, what kind of transaction did he say?

A. He said he had to go sell some dope.

*Id.* at 818–19, 66 S.Ct. 1239.

The Court finds this testimony relevant to the burglary and robbery charges since it relates to the source of the money Skaggs had in his possession. Interestingly, the testimony is to some extent exculpatory since a logical inference of Connally's statement is that Skaggs acquired the money by means other than by committing the alleged crimes.

Moreover, the testimony also clarifies the circumstances surrounding Skaggs' activities on the day of the crime. To this extent, it is not evidence of "other acts," but rather is inextricably intertwined with the charged offenses.

■ Skaggs also alleges constitutional error in the admission of testimony by Willie Jackson [hereinafter "Jackson"] to the effect that Jackson and Skaggs had "pulled time together." TE VI at 846. Jackson testified that on the morning of May 6, Skaggs approached him to see if he could assist Skaggs in perpetrating a robbery. *Id.* at 844, 66 S.Ct. 1239. The fact that Skaggs and Jackson were previously in prison together was introduced to show why Skaggs would have approached Jackson for assistance in committing the robbery. The testimony illustrates why Skaggs approached Jackson and why Skaggs believed that Jackson would be receptive to perpetrating a robbery. In order for the jury to accept Jackson's testimony, it needed to understand the relationship between Skaggs and Jackson. The evidence that Skaggs had "pulled time" is thus relevant to proving and substantiating Jackson's testimony that Skaggs intended to commit a robbery on the day in issue.

Skaggs next alleges constitutional error in the admission of testimony indicating that Skaggs was on a police-generated list of persons with the alleged propensity to commit robbery. TE VII at 949–50. The evidence, which pertained to testimony by Detective Tim O'Dell, was not objected to at trial. However, a review of O'Dell's testimony clearly establishes that Jackson, not Skaggs, was the person on that list and that it was Jackson who directed the police to Skaggs. Since O'Dell was not referring to Skaggs, O'Dell's testimony does not constitute prejudicial "other acts" evidence.

■ Finally, Skaggs alleges constitutional error in the admission of testimony from Detective O'Dell that Skaggs had "stolen" the murder weapon. In fact, O'Dell testified that Skaggs told O'Dell he had *"taken"* the murder weapon from John Davis's sister's home in Greensburg, Indiana. TE VII at 975. The testimony does not establish that

Skaggs "stole" the murder weapon. Moreover, the testimony is relevant to the prosecution's proof because it ties Skaggs to the murder weapon.

The Court finds, then, that the portion of above-discussed evidence which can properly be termed "other acts" evidence is relevant evidence and probative of the issues on which the prosecution bore the burden of proof. The Court concludes, therefore, that Skaggs due process rights were not violated by admission of the "other acts" evidence.

■ Moreover, assuming for the sake of argument that the "other acts" evidence was not relevant to an issue in the case, the record does not support that the evidence had a "substantial or injurious effect or influence in determining the jury's verdict." The "other acts" evidence was relatively sterile and isolated. This fact, coupled with the strong evidence supporting Skaggs' guilt, makes it highly improbable that the "other acts" evidence substantially influenced the jury's verdict. Cf. McKinney v. Rees, 993 F.2d 1378, 1386 (9th Cir.) (concluding it was highly probable that admission of "other acts" evidence had substantial and injurious effect on the jury's verdict where the prosecution lacked a "weighty" case against the defendant and the erroneously admitted evidence was pervasive throughout the trial), cert. denied, 510 U.S. 1020, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993).

### XIII.

*Skaggs' Eighth and Fourteenth Amendment Rights Were Violated by the Admission of Evidence at the Penalty Phase Regarding Skaggs' Prior Criminal History*

■ Skaggs next subscribes constitutional error to the introduction of evidence at the penalty phase retrial regarding his prior felony record. Specifically, Skaggs argues that it was constitutional error to the introduce evidence that he had previously been convicted of auto banditry, first degree robbery and second degree escape.

As noted in the prior section, errors by a state court in the admission of evidence generally are not reviewable by a habeas court "unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial. *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir.), *cert. denied*, 513 U.S. 1061, 115 S.Ct. 674, 130 L.Ed.2d 607 (1994). Therefore, whether evidence of Skaggs' prior criminal record was properly admitted under Kentucky law is not for this Court to decide. The issue here is whether introduction of Skaggs' prior criminal record at the penalty phase retrial violated Skaggs' federal constitutional rights.

As noted by Respondent, the Supreme Court has addressed this issue squarely, finding that "[n]othing in the United States Constitution prohibits a trial judge from instructing a jury that it would be appropriate to take account of a defendant's prior criminal record in making its sentencing determination." *Zant v. Stephens*, 462 U.S. 862, 888, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *see also Tuilaepa v. California*, 512 U.S. 967, 978, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (same). The Court, therefore, rejects Skaggs' argument as meritless.

### XIV.

*Skaggs Was Denied His Rights Under the Sixth, Eighth and Fourteenth Amendments by the Prosecutor's Repeated Statements, Coupled with the Trial Court's Instructions and Other Circumstances, that the Jury's Imposition of a Death Sentence Was Simply a Recommendation*

■ Skaggs next asserts that certain statements made by the prosecutor and the trial court instructions led to constitutional error by misleading the sentencing jury about its role in Kentucky's criminal justice system. Skaggs maintains that the statements and instructions unconstitutionally minimized the jury's perception of its sentencing responsibilities by suggesting that the jury's verdict was merely a "recommendation" and that Skaggs' penalty would ultimately be decided by the trial judge. Skaggs argues that minimizing the gravity of the jury's responsibility made it more likely the jury would return the death penalty.

To support this argument, Skaggs cites numerous portions of the record where the

prosecutor told prospective jurors that they were to "recommend" a sentence. Skaggs also refers the Court to numerous portions of the trial court's penalty phase instructions which likewise repeatedly advised the jury to "recommend" a sentence for Skaggs. Skaggs insists that this problem was compounded by media accounts between the two trials. The most damaging information, Skaggs maintains, was contained in a March 7, 1982 newspaper article in which the prosecutor was quoted as saying, "With a life sentence, Skaggs could be paroled in 8 years. But even if he were never executed, he would be in prison without parole if he were sentenced to the death penalty." Skaggs asserts that the obvious inference of this statement is that Skaggs could be sentenced to death by the jury, but still not be executed.

In arguing that the above-referenced statements and instructions rise to the level of a constitutional violation, Skaggs relies primarily on *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In *Caldwell,* the prosecutor prompted the jury that it was not determining whether the defendant would die because, under Mississippi law, the state supreme court automatically reviewed a death sentence for error. *Id.* at 325–26, 105 S.Ct. 2633. The Supreme Court vacated the sentence of death, holding that it is constitutionally impermissible for a sentencing jury to impose the death penalty where the jury "has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. 2633.

In *Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994), however, the Supreme Court subsequently explained that "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." (quoting *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). The issue is whether the jury was "affirmatively misled regarding its role in the sentencing process." *Id.* at 9, 114 S.Ct. 2004.

In Skaggs' case, the prosecutors conduct did not violate *Caldwell* because, at the time of Skaggs' sentencing and appeal, Kentucky law provided that

[t]he judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances ... exist and to recommend a sentence for the defendant. Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law.

KRS § 532.025(1)(b). Thus, the prosecutor's comments and jury instructions technically stated Kentucky law correctly.

Moreover, the facts here are quite similar to those in *Kordenbrock v. Scroggy,* 919 F.2d 1091 (6th Cir.1990), where the Sixth Circuit found no *Caldwell* violation in another Kentucky death penalty case. In *Kordenbrock,* the facts underlying the alleged *Caldwell* violation were that:

[d]uring voir dire ... the prosecutor told jurors that their 'recommendation of death, if you gave one as a juror, with your fellow jurors, would not be binding upon the court, but that the [c]ourt would give it great weight. The prosecutor characterized the jury's sentence as 'a recommendation, that is all.' Further, the instructions that the trial judge gave to the jury used the word 'recommend' in reference to the sentence.

*Id.* at 1101 [Internal citations omitted] The court noted that "[e]mphasizing the 'advisory role' of the jury, or the fact that the jury is making a 'recommendation' to the judge does not support a *Caldwell* claim." *Id.* The Court relied on the fact that the prosecutor did not affirmatively misrepresent the role of the jury under Kentucky law. *Id.* In the present case, the Court likewise finds that the prosecutor's statements and jury instructions contain no affirmative misrepresentations about the role of the sentencing jury and, therefore, fail to support a *Caldwell* violation.

## XV.

*Skaggs Alleges Violation of His Eighth and Fourteenth Amendment Rights Resulting From Highly Prejudicial Comments Made by the Trial Judge to a Prospective Juror at the Retrial of the Penalty Phase*

Skaggs' next complaint pertains to certain allegedly prejudicial comments

which the trial judge made to venire person Sandra Baxter [hereinafter "Baxter"] during juror voir dire of the penalty phase retrial.[18] During group voir dire, Baxter indicated she had formed some opinions about the case. During individual voir dire of Baxter, the trial judge stated, "I just wanted to tell Mrs. Baxter that I formed an opinion, too. The only part is my opinion don't count." TE XIV 1982. Skaggs maintains that the comment was highly improper since it may have suggested to Baxter that the trial judge supported a sentence of death. Skaggs asserts that the trial judge compounded the prejudicial effect of the statement by subsequently telling Baxter that once the jury heard the evidence "it won't appear as difficult then as it is now." *Id.* at 1985–86. Skaggs alleges that the remark was not an isolated instance of judicial impropriety. During voir dire of prospective juror Everett Stilts, Stilts indicated that he had formed an opinion about the case. The trial judge then commented on the deadlock by the first jury saying, "That same jury decided the same thing, that there ought to be something done, but the problem is they wouldn't do it." *Id.* at 1968.

Having reviewed those portions of the record to which Skaggs objects, the Court rejects this argument as meritless. Skaggs seeks to attribute the most sinister meaning possible to the judge's comments despite the fact that, viewing the statements objectively, it is not entirely clear what the trial judge was attempting to say. Most important, accepting Skaggs' interpretation for the sake of argument, these isolated statements made during juror voir dire are not "of a sort most likely to remain firmly lodged in the memory of [the prospective juror] and to excite a prejudice which would preclude a fair and

dispassionate consideration of the evidence." *Quercia v. United States,* 289 U.S. 466, 472, 53 S.Ct. 698, 77 L.Ed. 1321 (1933).

## XVI.

### *Skaggs Alleges That His Sixth, Eighth and Fourteenth Amendments Right Were Violated When the Trial Judge Improperly Excluded for Cause Several Venirepersons Due to Their Feelings About the Death Penalty*

Skaggs' sixteenth contention of error is that he was denied his constitutional rights when the trial judge excluded certain jurors for cause both at the first trial and at the penalty phase retrial. The trial judge excluded the jurors upon challenges for cause based on the trial judge's conclusion that the jurors' opposition to the death penalty prevented them from performing their duties in accordance with the court's instructions and their oath as jurors.

Skaggs agrees with Respondent that a juror may be excused for cause only if the juror's responses evidence that the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). However, Skaggs maintains that the excluded jurors were merely equivocal on whether they could consider imposing the death penalty and, therefore, were improperly excluded from the panel.

In reviewing this issue, the Court is mindful that a trial judge's decision on excluding a prospective juror because of his or her opposition to capital punishment is a

---

**18.** Respondent initially maintains that Skaggs is procedurally barred from raising this argument because Skaggs' counsel did not object to these statements at the time they were made. However, the Court notes that Skaggs did raise this argument on direct appeal. Although the Kentucky Supreme Court did not directly address this argument, it appears that the court may have generally responded to Skaggs' argument by finding no evidence of bias or prejudice regarding Juror Baxter. *See Skaggs,* 694 S.W.2d at 676 ("Juror Baxter stated that she could set aside information received outside the proceedings and render a decision based solely on the evi-

dence.") Clearly, however, the Kentucky Supreme Court did not specifically state that Skaggs was procedurally barred from raising this argument on direct appeal. In light of this fact, coupled with the fact that Petitioner is facing the death penalty, the Court will address the merits of this argument. *See Harris v. Reed,* 489 U.S. 255, 265 n. 12, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("If the state supreme court under state law chooses not to rely on a procedural bar in such circumstances the there is not basis for a federal habeas court's refusing to consider the merits of the federal claim.").

factual issue subject to deference under 28 U.S.C. § 2254(d), *see Witt,* 469 U.S. at 426–30, 105 S.Ct. 844, and, therefore, is entitled to a "presumption of correctness" by a habeas court. As such, the Court's review is limited to determining whether the record "fairly supports" the trial judge's finding on this issue.[19] *Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983).

■ At issue here is the trial judge's exclusion of three venirepersons: Jerry Rhodes ["Rhodes"], Elizabeth Yates ["Yates'] and J.D. Byrd ["Byrd"]. Jurors Rhodes and Yates were excluded for cause from the panel in Skaggs' first trial. As a result, assuming arguendo that Rhodes and Yates were improperly excluded, the remedy for such constitutional violation would be to afford Skaggs a new trial on the penalty issue. Since Skaggs was given a new penalty trial after the first jury hung on the penalty issue, any error in excluding Jurors Rhodes and Yates from the first panel was harmless. The Court notes, however, that it has reviewed those portions of the record dealing with Rhodes' and Yates' voir dire and finds that the record fairly supports the trial judge's decision to exclude Rhodes and Yates for cause.

■ Moreover, the trial judge's decision to exclude Juror Byrd from the panel is also fairly supported by the record. The relevant portions of Juror Byrd's voir dire testimony are as follows:

Q. ... Would you be willing to sit in this case if you are selected and do your best to make a final conclusion?

A. Yeah, I could, but I don't believe I could give him the death penalty.

Q. Let me ask it this way. When it comes around to the decision, the court will instruct you that you could recommend punishment to be one of the following three: Confinement in the penitentiary for not less than twenty years, stating the exact number of years that you recommend, or the penalty of confinement in the penitentiary for life, or the final would be the death penalty. Now, having those

three as being the alternatives, at this time, could you consider all three of those penalties?

A. I don't believe I could. I could two of them, but I couldn't one.

Q. You mentioned there before I asked that question that the last one, the death penalty, you couldn't consider.

A. No.

Q. Under any circumstances?

A. I don't believe I could.

Q. And you understand at this time that we have to select a jury that could consider all of them and then decide after they hear the evidence which one it ought to be?

A. Yeah, I understand.

Q. But regardless of the circumstances, you just personally feel you couldn't consider that one?

A. I couldn't.

Q. Have you expressed an opinion on that subject, that third penalty I mentioned before?

A. Yes, I have.

\* \* \* \* \* \*

Q. Mr. Byrd, do you understand that as citizens we all have a duty to follow the law, even though we don't necessarily agree with it all the time?

A. Yes, I do.

Q. And in murder cases where the jury finds certain aggravating factors, the law requires the jury to consider whether a death sentence should be imposed, doesn't require them to impose that penalty, only consider whether it should be imposed. Do you think that you could follow your duty as a citizen and simply consider that penalty along with the other ones that the judge instructs you on and simply consider whether a death sentence should be imposed in this case?

A. I wouldn't want to, I don't think. I could, but I wouldn't want to.

Q. You could, but you would rather not, is that what your position is?

A. Yes.

---

**19.** It is not necessary for the trial court to issue specific written findings of fact on excusal when the finding is evident from the record. *Witt,* 469 U.S. at 430, 105 S.Ct. 844.

Q. Mr. Byrd, can you think of any type cases where you think a death penalty would be warranted; for example, a case where a terrorist had killed a number of children or women or people on an airplane? I guess what I am asking you is there any case where you think that the death penalty would be warranted, or are you saying in advance, "No, I could never consider it."

A. I just don't really believe in it.

Q. But, as you said before, you could consider whether it should be imposed, you would just prefer not to have to make that decision?

A. Yes.

Q. Mr. Byrd, let me get this correct. After hearing your answers to the questions of the attorneys, I get the impression that your hangup, if you want to call it that, is this death penalty, is that right?

A. Yes, that's right.

Q. Now, are you telling the court—now, you make the answers now, I don't want to make the answers—but do you want to tell the court, and are you telling the court, in this case, after hearing all the evidence and the case is submitted to you, that you would not, under any circumstance, vote for the death penalty?

A. I don't believe I would. I will just be honest with you.

Q. Well, I am honest with you, now; you be honest with me. I know you are—

A. I couldn't do it.

Q. I don't want to use that word, but just make it out plain.

A. I wouldn't do it.

Q. You just wouldn't do it?

A. Uh-uh.

Q. Mr. Byrd, the judge asked you could you vote for it, and you said you didn't think you could. Could you consider it, consider whether it should be imposed or not in this case, or any case?

A. Yes, I guess I could consider it.

Q. Let me ask you this, Mr. Byrd. Do you have in your mind right now that that—you see, we have three penalties that I read to you a moment ago—do you have

in your mind right now that you would just automatically vote against one of them?

A. Yes, I do.

Q. So that if you were selected, you really wouldn't be following the judge's instructions when he says you have got three of them; you are just right now going to mark off one of them?

A. That's right.

Q. You understand that would not be entering the trial with an open mind, would you?

A. No, I wouldn't.

TE XII at 1739–44.

In light of this testimony, taken as a whole, Juror Byrd was properly excluded from the panel. Although Byrd appeared to equivocate at times, he repeatedly stated that he would not and could not consider imposing the death penalty. The record thus fairly supports the trial judge's decision to dismiss Byrd for cause. Byrd's unwillingness to consider the death penalty would necessarily prevent or substantially impair his ability to follow the court's instructions on the penalty issue. In light of the foregoing, the Court finds no constitutional violation on this issue.

## XVII.

*Skaggs Alleges That the Trial Court Violated His Eighth and Fourteenth Amendment Constitutional Rights By Failing to Instruct the Jury on All Applicable Mitigating Circumstances*

 Skaggs' next complaint is that the jury instructions regarding mitigation of punishment were constitutionally deficient because the trial court refused to separately enumerate certain non-statutory mitigating facts that were supported by the evidence. Skaggs notes that the trial court specifically instructed the jury on three statutory mitigating factors: 1) extreme emotional disturbance; 2) mental disease or defect and/or intoxication; and 3) age. The trial court also instructed the jury to consider as mitigating "those aspects of defendant's character and record about which he has offered evidence in mitigation of the penalty to be imposed upon him and which you believe from the evidence to be true," along with "any other

fact or circumstance which you consider mitigating even if such are not [specifically listed]." TR VIII at 1164, 1171. Skaggs objects, however, to the trial court's refusal to specifically instruct the jury to consider as mitigating 1) the fact that Skaggs confessed to the crime(s); 2) the fact that Skaggs cooperated with police by helping them to locate evidence; and 3) the circumstances surrounding Skaggs' upbringing.

■ In *Penry v. Lynaugh*, 492 U.S. 302, 317, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the Supreme Court reaffirmed that a sentencer may not be prevented from "considering, as a mitigating factor, any aspect of a defendant's character or record or and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *See also Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (same). Moreover, the mere possibility that the jury might have misinterpreted the instructions is insufficient to establish error of constitutional magnitude. *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). Rather, the court must find a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.*

In the present case, the Court finds no evidence that the jury's consideration of mitigating evidence was limited in any way. During the penalty phase retrial, Skaggs presented evidence concerning his confessions, his cooperation with the police, his mental state at the time of the crimes, and the circumstances surrounding his upbringing. None of this evidence was objected to or otherwise limited by the trial court. The instructions clearly set forth that the jury "shall consider" not only the listed statutory mitigating factors, but also "those aspects of the defendant's character and record about which he has offered evidence in mitigation" and "any other fact or circumstance which you consider mitigating." TR VIII at 1164, 1171. The instructions also define "mitigating circumstances" to mean "factors put forth to show the appropriate sentence is a sentence other than death." TR VIII at 1167, 1174. Under the circumstances, the Court finds no "reasonable likelihood" that the jury felt limited in its consideration of the mitigation evidence presented by Skaggs. The trial court's failure to specifically enumerate the nonstatutory mitigating factors presented by Skaggs does not constitute a constitutional violation.

## XVIII.

### Skaggs Alleges That His Sixth, Eighth and Fourteenth Amendment Rights Were Violated When the Trial Judge Refused to Strike for Cause Veniremen Who Could Not Consider a Penalty of Less Than Death

■ Skaggs' next complaint is that the trial court erred by failing to remove for cause venirepersons Richard Jones ["Jones"] and David Passmore ["Passmore"] because of their allegedly biased views on capital punishment. Skaggs maintains that Jones' and Passmore's responses during voir dire evidenced that their ability to consider any sentence less than death was "substantially impaired." Moreover, Skaggs insists that the trial judge's findings on the impartiality of Jurors Jones and Passmore are not entitled to deference because, in fact, the trial judge applied the wrong standard in making this assessment: rather than properly considering whether Jones' and Passmore's ability to consider a sentence less than death was "substantially impaired," the trial judge considered only whether the jurors would "automatically and unequivocally" vote for the death penalty. Skaggs asserts that the trial court's failure to exclude Jones and Passmore for cause required Skaggs to unnecessarily exhaust his peremptory challenges, thus violating his due process rights to a fair trial and an impartial jury.[20]

■ This argument is fatally flawed. Jones and Passmore were in the jury venire for Skaggs' first trial. After the first jury

---

**20.** The record indicates that while Skaggs did, in fact, exercise a peremptory challenge to remove Juror Jones from the panel, Juror Passmore was removed from the panel on a peremptory challenge exercised by the Commonwealth.

hung on the penalty issue, Skaggs received a new trial on this issue. Jones and Passmore were not part of the venire at the penalty phase retrial and, thus, took no part in the jury's decision to give Skaggs the death penalty. In *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the Supreme Court held that when determining whether a defendant was deprived of the Sixth Amendment right to an impartial jury, a reviewing court need look only at the jury that actually sat, not at the jurors excused for cause or by peremptory challenge. Moreover, in *McQueen v. Scroggy,* 99 F.3d 1302 (1996), the Sixth Circuit explained:

> Even assuming that the inclusion of [the allegedly impartial juror] on the jury would have been unconstitutional, the fact remains that [the juror] was excluded by peremptory challenge. [The petitioner] is unable to demonstrate what constitutional harm resulted from this. There is no constitutional right to peremptory challenges, and there is no showing that had there been one more peremptory available, it would have had any effect on the trial at all, let alone that the lack of a peremptory (because it was used on [the allegedly impartial juror] ) resulted in an unconstitutionally biased jury. It is insufficient simply to say that, had there been another peremptory available, a different juror would have been excluded, and the result might have been a more favorable jury for [the petitioner]. In other words, it is not enough for a defendant to say 'I would have been better off if. . . .' He must demonstrate that judicial or prosecutorial action (or inaction) resulted in a constitutional violation, not a tactical or strategic disadvantage. The Constitution is not designed to afford either party a right to the most advantageous tactical or strategic situation possible. It is designed to insure that a person receives a fair trial by an impartial jury.

*Id.* at 1320–21.

Skaggs also argues that use of a peremptory to challenge a juror who should have been excused for cause is a due process violation. Skaggs asserts that the Supreme Court's due process holding in *Ross* was based on the fact that the defendant there "received all that Oklahoma law allowed him" in the way of peremptory challenges. Under Oklahoma law, the defense was obligated to challenge jurors who should have been excused for cause in order to preserve appeal on the impartial jury issue. *Ross,* at 91, 108 S.Ct. 2273. Skaggs posits that under Kentucky law, however, "prejudice is presumed, and the defendant is entitled to a reversal in those cases where a defendant is forced to exhaust his peremptory challenges against prospective jurors who should have been excused for cause." *See Thomas v. Commonwealth,* 864 S.W.2d 252, 259 (Ky.1993), *cert. denied,* 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994). Therefore, Skaggs maintains, under the holding of *Ross,* habeas relief is warranted because he was denied his due process rights.

The Court disagrees. Although the *Ross* Court based its due process holding on the fact that the defendant received the peremptories allotted him under Oklahoma law, the Court specifically declined to decide "whether, in the absence of Oklahoma's limitation on the 'right' to exercise peremptory challenges, 'a denial or impairment' of the exercise of peremptory challenges occurs if the defendant uses one or more challenges to remove jurors who should have been excused for cause." *Ross* at 91 n. 4, 108 S.Ct. 2273. It does not appear that the Supreme Court has revisited this issue since that time, nor is the Court aware of other precedent supporting the existence of such a right. Therefore, assuming arguendo that Skaggs could establish that Juror Smith should have been excused for cause, the due process violation Skaggs urges the Court to recognize was not "dictated by precedent existing" at the time Skaggs' conviction became final on May 19, 1986, the date on which the United States Supreme Court denied Skaggs' petition for certiorari on direct appeal. In light of this fact, granting Skaggs relief under the due process clause would require application of a new rule of constitutional law barred from application on collateral review by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *See Satcher v. Pruett,* 126 F.3d 561, 574–75 (4th Cir.) (rejecting same due process argument where the defen-

dant's conviction became final on February 19, 1993), *cert. denied,* —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997).

## XIX.

### *Skaggs Alleges His Eighth and Fourteenth Amendment Constitutional Rights Were Violated When at the Penalty Phase Retrial the Trial Judge Refused to Strike a Juror Who Had Already Formed an Opinion as to the Appropriate Remedy*

Skaggs revisits his prior argument, this time alleging that the penalty phase retrial judge improperly refused to excuse for cause Juror Everett Stilts ["Stilts"]; thus requiring Skaggs to exercise a peremptory challenge to excuse Stilts from the panel. As previously mentioned, Skaggs has no constitutional right to peremptory challenges. Moreover, Stilts did not sit on the jury that sentenced Skaggs to death. Under the circumstances, Skaggs was not denied his constitutional right to a fair trial and impartial jury by the trial judge's refusal to dismiss Stilts for cause. *See Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) ("So long as the jury that sits is impartial, the fact that the defendant had to use the peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated."); *see also Siripongs v. Calderon,* 35 F.3d 1308, 1322 (9th Cir.1994) (finding it immaterial that the habeas petitioner "may have been required to use preemptory challenges to excuse jurors that the trial court would have excused for cause had it employed the proper standard"), *cert. denied,* 513 U.S. 1183, 115 S.Ct. 1175, 130 L.Ed.2d 1127 (1995); *see also* Section XVIII, *supra* (rejecting Skaggs' due process argument under *Teague v. Lane* ).

## XX.

### *Skaggs Alleges His Constitutional Rights Were Violated at the Retrial of the Penalty Phase by the Trial Court's Refusal to Strike a Juror Who Stated She Would Consider the Possibility of Parole in Assessing Skaggs' Penalty*

Again, Skaggs argues that his due process rights to a fair trial and an impartial jury were violated—this time by the trial judge's refusal to excuse for cause Juror Doris Mills ["Mills"]. Skaggs maintains that Mills' responses during voir dire indicate that Mills would be improperly influenced in her verdict by the possibility of parole. Skaggs notes that if the jury had inquired about his parole eligibility under a life sentence, the trial judge was obligated to instruct the jury not to consider parole. Skaggs contends that he was entitled to a jury which would abide by the trial court's instruction on this issue and, thus, was unconstitutionally required to exercise one of his peremptory challenges to ensure his right to a fair trial and impartial jury.

This argument fails for the reasons articulated in Sections XVIII and XIX, *supra.* Mills did not sit on the jury that sentenced Skaggs to death. Furthermore, precedent existing at the time Skaggs' conviction became final would not support that Skaggs' due process rights were violated by having to challenge peremptorily a juror who should have been removed for cause. Moreover, a "capital defendant has no federal right to prevent the sentencing jury from considering the possibility that he will be paroled if sentenced to life imprisonment." *Ingram v. Zant,* 26 F.3d 1047, 1053 (11th Cir.1994). Therefore, the Court rejects Skaggs' arguments on this issue.

## XXI.

### *Skaggs Maintains That the Jury Instructions Were Constitutionally Deficient*

Skaggs next assigns constitutional error to the trial court's jury instructions at both the guilt and penalty phases of trial. In order to grant habeas relief on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are "undesirable, erroneous, or even universally condemned"; taken as a whole, the instructions must be so infirm that they render the entire trial fundamentally unfair. *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Moreover, the Supreme Court has "defined the category of infractions that violate fundamental fairness

very narrowly." *Id.* at 72–73, 112 S.Ct. 475 (quoting *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)) [Internal quotations omitted]. If an instruction is ambiguous and not necessarily erroneous, it runs afoul of the Constitution only if there is a reasonably likelihood that the jury applied the challenged instruction in a way that violates the Constitution. *Id.* at 72 & 73 n. 4, 112 S.Ct. 475; *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). However, instructional errors of state law will rarely form the basis for federal habeas corpus relief. *Gilmore v. Taylor,* 508 U.S. 333, 344, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993).

### A. "Life Option" Instruction

Skaggs maintains that the instructions failed to inform the jurors that they could sentence petitioner to life or a term of years despite finding the existence of one or more aggravating factors. The Court essentially addressed this argument in Section X, *supra,* in discussing Skaggs' contentions that the verdict form was constitutionally infirm because it did not allow the jury to recommend any sentence other than death once the jury found one of the statutory aggravating circumstances. Accordingly, the Court need not further address this issue.

### B. Failure to Instruct on Requisite Elements of Aggravating Factors of Robbery and Burglary

■ Skaggs' next complaint about the penalty instructions is that the instructions did not define the elements of first degree robbery and first degree burglary, statutory aggravating factors which would support imposition of the death penalty. Skaggs cites no federal constitutional authority to support his claim. Moreover, the Kentucky Supreme Court rejected this same argument on direct appeal:

Skaggs cites no authority for such a requirement, and we cannot find any rationale for the argument. During the guilt phase of the trial, Skaggs was found guilty of first-degree robbery and burglary.... To require the penalty jury to make a finding on the elements of robbery and

burglary would render the first verdict useless.

The Court agrees that it was unnecessary to define the elements of first degree burglary and robbery in the penalty phase instructions. The findings made in the guilt-innocence phase of the trial were sufficient to establish the existence of these factors beyond a reasonable doubt.

### C. Failure to Explain Role of Mitigation

Skaggs next alleges that the jury instructions failed to adequately explain the role of mitigating circumstances. The Court essentially addressed the constitutional sufficiency of the instructions regarding mitigating factors in Section XVII, *supra,* and finds it unnecessary to further address the issue.

### D. Failure to Provide Standards of Proof for Mitigation

■ Skaggs complains that the court's instructions did not specify the standard of proof regarding mitigating evidence. Skaggs maintains that the jury should have been charged that mitigating circumstances could be considered if proven by a preponderance of the evidence.

At Skaggs' trial, the jury was provided with a list of aggravating and mitigating circumstances. The instructions and verdict form required the jury to make specific findings regarding the existence of aggravating circumstances that would warrant imposition of the death penalty. Although the jury was also instructed that aggravating circumstances had to be proven beyond a reasonable doubt, the jury was not told that it could consider only those mitigating circumstances that had been proven by a particular standard of proof. Rather, in addition to certain listed mitigating circumstances, the jury was instructed to consider "those aspects of [Skaggs'] character and record about which he ... offered evidence in mitigation of the penalty to be imposed upon him and which you believe from the evidence to be true" along with "any other fact or circumstance which you consider mitigating" even if not listed. TR at 1164, 1171.

However, despite Skaggs' arguments to the contrary, the instructions are not constitutionally infirm. There appears to be no

constitutional requirement that a death penalty scheme establish a particular standard of proof for the consideration of mitigating circumstances. *See Walton v. Arizona,* 497 U.S. 639, 650, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Kordenbrock v. Scroggy,* 680 F.Supp. 867, 893 (E.D.Ky.1988) (citing *Peek v. Kemp,* 784 F.2d 1479, 1494 (11th Cir.1986) (holding that Constitution requires that "jury instructions guide and focuses the jury's consideration of mitigating circumstances" so that "there be no reasonable possibility that a juror will misunderstand the meaning and function of mitigating circumstances)), *rev'd on other grounds,* 919 F.2d 1091 (6th Cir. 1990), *cert. denied,* 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991). Accordingly, the Court finds no error in the trial court's refusal to instruct the jury in this regard.

### E. Absence of Any Findings on Mitigation

■ Skaggs also complains about the trial court's failure to require the jury to make findings of mitigating circumstances. Skaggs maintains that the lack of findings regarding mitigating circumstances precludes meaningful review of the factors considered by the jury in making its determination. The Court disagrees. Capital sentencing juries are not required to make specific findings on mitigating circumstances in order to satisfy the demands of the due process clause. *Jeffries v. Blodgett,* 5 F.3d 1180, 1196–97 (9th Cir.1993), *cert. denied,* 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994). No case exists from any federal court that supports this proposition. *See McQueen,* 99 F.3d at 1332. "The failure of the trial court to require the jury to list mitigating circumstances does not rise to the level of a constitutional violation." *Id.* (quoting *Rook v. Rice,* 783 F.2d 401, 407 (4th Cir.1986).

In fact, the Supreme Court recently rejected a similar argument in *Buchanan v. Angelone,* ── U.S. ──, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). The Court determined that the Constitution does not require states to explain mitigating circumstances in death penalty actions. *Id.* at 761–762. Constitutional standards are met as long as the jury knows that it may consider mitigating circumstances in conjunction with aggravating

circumstances when considering an appropriate penalty for the crime. *See id.*

Skaggs has not demonstrated a constitutional violation regarding the trial court's failure to require specific findings regarding mitigating circumstances. The claim, therefore, simply cannot provide the basis for granting the writ of habeas corpus.

### F. *Prosecutor's Burden of Proof*

■ Skaggs alleges constitutional error based on the fact that the jury instructions did not articulate who has the burden to prove the existence of aggravating factors and that aggravating circumstances outweigh mitigating circumstances.

The instructions allowed the jury to return a sentence of death only upon finding the existence of an aggravating circumstance "from the evidence beyond a reasonable doubt." TR VIII at 1165–66, 1172–73. The jury was also instructed that if it had a reasonable doubt as to the truth of the existence of an aggravating circumstance, it was not to make a finding regarding that aggravating circumstance. *Id.* at 1166, 1173. The instructions also stated:

> In considering the evidence which may be unfavorable to the defendant, you are instructed that the law presumes the defendant innocent unless, and until, you are satisfied from the evidence beyond a reasonable doubt that he is guilty.

*Id.* at 1162, 1169. Moreover, the Supreme Court has held that the Constitution does not require that the jury be instructed to weigh aggravating circumstances against mitigating circumstances. *See Tuilaepa v. California,* 512 U.S. 967, 979, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) ("A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."). Thus, the Court finds no constitutional error.

### G.–H. *Failure to Require Weighing of Aggravating and Mitigating Circumstances, to Require Finding that Aggravation Outweigh Mitigation Beyond a Reasonable Doubt, and to Require Finding that Death is the Appropriate Penalty Beyond a Reasonable Doubt*

■ Again, Skaggs alleges constitutional error based on the instructions guiding the

jury's consideration of aggravating and mitigating circumstances. Again, the Court dismisses Skaggs' allegations as meritless. There simply is no federal constitutional right requiring the jury to weigh aggravating and mitigating circumstances, to determine that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt[21] or to determine that death is the appropriate penalty beyond a reasonable doubt.[22] *See Tuilaepa,* 512 U.S. at 969, 114 S.Ct. 2630. Moreover, the state law cases on which Skaggs' relies are inapposite to the Court's considerations on habeas review.

## I. *Failure to Limit Consideration of Aggravating Evidence*

Skaggs next asserts constitutional error in the trial court's alleged failure to specifically limit the jury's consideration of aggravating evidence to those circumstances enumerated in the Kentucky statute or to the aggravating circumstances listed in the instructions. Skaggs notes that the "prosecutor, in a pattern throughout the trial, injected various non-statutory aggravating factors into the crucible. It is likely that a reasonable juror could well have relied upon this information in reaching a determination of death." Petitioner's Brief at 198.

■ The Court disagrees. "[A]lthough a death sentence may not rest *solely* on a nonstatutory aggravating factor, the Constitution does not prohibit consideration at the sentencing phase of information not directly related to either statutory aggravating or statutory mitigating factors, as long as that information is relevant to the character of the defendant or the circumstances of the crime." *Barclay v. Florida,* 463 U.S. 939, 966–67, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (Stevens, J., concurring) [Emphasis in original].

Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.

*Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) [Emphasis in original].

■ In the present case, the jury was appropriately guided in its consideration of aggravating circumstances. The trial court instructed the jury regarding certain statutory aggravating factors. With respect to the penalty for the murder of Herman Matthews, the instructions provided:

In recommending a sentence for the defendant, you shall consider such of the following, if any, as you believe from the evidence beyond a reasonable doubt to be true:

(a) That at the time David Skaggs killed Herman Matthews he was engaged in the commission of robbery in the first degree by the use of a .25–caliber pistol, a deadly weapon.

(b) That the defendant's act in killing Herman Matthews was intentional and also resulted in the death of May Matthews.

TR VIII at 1165. With respect to the penalty for the murder of May Matthews, the instructions provided:

In recommending a sentence for the defendant, you shall consider such of the following, if any, as you believe from the evi-

---

**21.** The Court notes, however, that the jury instructions directed the jury that "[i]f you have a reasonable doubt as to the truth of the existence of any one of the 'aggravating circumstances' listed in Instruction 2, you shall not make any finding with respect to it." TR at 1166, 1172. Essentially, then, the trial court did instruct the jury that it must find the existence of a statutory aggravating factor "beyond a reasonable doubt."

**22.** Nevertheless, the jury was instructed that "in considering the evidence which may be unfavorable to the defendant, you are instructed that the law presumes a defendant innocent unless and until, you are satisfied from the evidence beyond a reasonable doubt that he is guilty." TR VIII at 1162, 1169.

dence beyond a reasonable doubt to be true:

(a) That at the time he killed May Matthews, he was engaged in the commission of burglary in the first degree by unlawfully entering the dwelling house of May Matthews for the purpose of committing a crime, and

(b) That at the time he killed May Matthews, the defendant was engaged in the commission of robbery in the first degree, accomplished by the use of a .25–caliber pistol, a deadly weapon.

*Id.* at 1172.[23] The jury was further instructed that it could not impose a sentence of death unless it was "satisfied from the evidence beyond a reasonable doubt that at least one of the [listed aggravating circumstances] is true in its entirety, in which case you must designate in writing, signed by the foreman, which of the aggravating circumstances you found beyond a reasonable doubt to be true." *Id.* at 1166, 1173. The jury found each listed aggravating circumstance to exist in reaching a penalty verdict for both murders. Thus, assuming arguendo that the jury did consider certain non-statutory factors in fixing Skaggs' penalty, since the jury also found that the listed statutory factors existed beyond a reasonable doubt, there exists no error of constitutional proportion.

Moreover, in spite of the fact that the jury was not explicitly instructed to consider only the listed statutory aggravating factors, it is pure conjecture that the jury considered anything other than the listed factors in fixing Skaggs' penalty. Assuming arguendo that the jury did consider Skaggs' prior criminal record, there is no constitutional error since Skaggs' criminal record is relevant to his character. *See Zant v. Stephens,* 462 U.S. at 879, 103 S.Ct. 2733.

---

**23.** Skaggs does not dispute that the listed aggravating circumstances are statutorily authorized considerations pursuant to KRS 532.025.

**24.** In his concurring opinion in *Carter,* 450 U.S. at 307, 101 S.Ct. 1112, Justice Stevens underscored the defendant's need to make a timely request for such an instruction:

> While I join the Court's opinion, I add this comment to emphasize that today's holding is

## J. *Failure to Instruct on Skaggs' Right Not to Testify in the Penalty Phase*

Skaggs next maintains that the trial judge should have instructed the jury that Skaggs had no obligation to testify in mitigation and that the jury should draw no adverse inference from Skaggs' failure to testify. This argument also must fail. On direct appeal, the Kentucky Supreme Court found, and the record supports, that Skaggs' counsel made no request for such an instruction. *Skaggs,* 694 S.W.2d at 680. The Supreme Court has indicated that such an instruction is not constitutionally mandated absent a timely request by the defendant. *Carter v. Kentucky,* 450 U.S. 288, 305, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981).[24]

## K. *Passion or Prejudice*

Skaggs also alleges error in the trial court's refusal to instruct the jury that it should not be influenced by considerations of passion or prejudice. Although the Supreme Court has indicated that it is constitutionally *permissible* in a capital sentencing proceeding to instruct the jury that it should disregard passion, prejudice and mere sympathy, *see California v. Brown,* 479 U.S. 538, 543, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the Court is unaware of case law establishing that such an instruction is constitutionally *mandated.*

## L. *Presumption that Life Sentence Means Life*

Skaggs complains that the jury should have been told to presume that a life sentence would result in life imprisonment. In *Kordenbrock v. Scroggy,* 680 F.Supp. at 893 (citing *Tucker v. Zant,* 724 F.2d 882, 892 (11th Cir.1984) (finding no constitutional violation where trial judge failed to instruct the

---

> limited to cases in which the defendant has requested that the jury be instructed not to draw an inference of guilt from the defendant's failure to testify. I remain convinced that the question whether such an instruction should be given in any specific case—like the question whether the defendant should testify on his own behalf—should be answered by the defendant and his lawyer, not by the State.

jury to disregard possibility that the capital defendant could be paroled if sentenced to life in prison)), *rev'd on other grounds,* 919 F.2d 1091 (6th Cir.1990) (en banc), the court held that the petitioner was "not entitled to an instruction telling the jury that life sentence means life sentence and that it could not legally presume otherwise." *Id.* at 893. Accordingly, the Court finds no constitutional violation resulting from the trial court's refusal to instruct the jury in this regard.

### M. *Definition of Reasonable Doubt*

■ Skaggs also alleges the trial court committed constitutional error by denying his request for an instruction defining reasonable doubt. Skaggs maintains that one of the accepted definitions of reasonable doubt should have been offered to the jury. Initially, the Court notes that Kentucky courts do not define the term "reasonable doubt." *See Commonwealth v. Callahan,* 675 S.W.2d 391, 392 (Ky.1984). Furthermore, the definition of reasonable doubt is not constitutionally mandated. *See Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) ("The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course."). Moreover, the Fifth Circuit has indicated that "attempts by trial courts to define 'reasonable doubt' have been disfavored by this court. Such attempts often result in using the term itself in the definition and serve only to confuse the concept in the minds of jurors." *Thompson v. Lynaugh,* 821 F.2d 1054, 1061 (5th Cir.), *cert. denied,* 483 U.S. 1035, 108 S.Ct. 5, 97 L.Ed.2d 794 (1987). In light of the foregoing, the Court finds this argument meritless.

### N. *Non–Unanimous Finding on Mitigating Factors*

■ Skaggs next asserts constitutional error in the trial court's failure to instruct the jury that a unanimous finding with respect to mitigating factors was not required. The Sixth Circuit rejected this same argument in *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1121 (6th Cir.1990), when faced with similar instructions. In *Kordenbrock,* the habeas petitioner challenged instructions that required the jury to find aggravating circumstances unanimously, but were silent as to whether the jury was precluded from considering any mitigating evidence unless the jury unanimously agreed on the existence of a particular mitigating circumstance. *Id.* at 1121. In concluding that the challenged instructions did not deprive the defendant of his constitutional right to due process, the Sixth Circuit distinguished the facts from those presented in *Kubat v. Thieret,* 867 F.2d 351 (7th Cir.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989), where the jury was *specifically instructed* that it must find mitigating factors unanimously. *Kordenbrock,* 919 F.2d at 1121. The Sixth Circuit concluded that although "the instructions carefully stated that finding an *aggravating* factor required [unanimous] agreement, . . . it cannot be reasonably inferred that silence as to finding a mitigating factor would likely cause the jury to assume that unanimity was also a requirement." *Id.* [Emphasis in original]

In the present case, the Court finds it even less likely that the jury interpreted the instructions to require that it unanimously agree on a particular mitigating circumstance before considering that circumstance. Although the instructions required the jury to unanimously agree on a verdict of death, the instructions did not explicitly require a finding of unanimity as to *aggravating* or *mitigating* circumstances. In light of this fact, the Court finds it unlikely that the jury believed that finding a mitigating circumstance required unanimity.

### O. *A Sentence Less Than Death When Any Juror Disagrees*

■ Skaggs next argues that the jury should have been instructed that, if any juror had a reasonable doubt as to the appropriateness of a sentence of death, the jury must impose a penalty less than death. On direct appeal, the Kentucky Supreme Court held that Kentucky law did not authorize or require a sentence of imprisonment when the jury failed to unanimously agree on a death sentence. *Skaggs,* 694 S.W.2d at 681. Moreover, the Court finds no authority supporting

that the absence of such an instruction constitutes a due process violation. The case law on which Skaggs relies is inapposite to the Court's focus on habeas review.

### P. *Presumption of Life—No Presumption of Death*

■ Skaggs next complains that the jury should have been instructed that "[t]he law presumes David Skaggs is innocent of the aggravating circumstances and the law, consequently, presumes that the appropriate sentence for murder is a punishment other than death." Skaggs also maintains that the jury should have been instructed that "there is no preference in the law nor by the court for the imposition of the death penalty as the appropriate sentence."

The Court disagrees. The penalty phase instructions charged the jury to presume Skaggs innocent, "unless and until you are satisfied from the evidence beyond a reasonable doubt that he is guilty." TR VIII at 1162, 1169. The jury was also instructed to resolve any reasonable doubt in favor of a sentence of imprisonment. *Id.* at 1166, 1173 ("If upon the whole case you have a reasonable doubt whether the defendant should be sentenced to death, you shall recommend a sentence of imprisonment instead.") The jury was thus adequately charged on the presumption of innocence and the burden of proof. Skaggs cites no precedent supporting a contrary conclusion.

### Q. *Instructions Failed to Adequately Guide Jury in its Deliberations*

Basically, Skaggs argues here that the instructions failed to adequately guide and instruct the jury's consideration of mitigating evidence. The Court has already discussed the sufficiency of the instructions in this regard. *See* Section XXI at C, D; Section XVII.

### XXII.

### *Skaggs Maintains That the Method of Selection of Persons to Be Included in the Grand Jury and Jury Venire was not Representative of the Community*

Skaggs assigns error to the method employed for selecting members of the grand jury and jury venire. Specifically, he contends that the selection process prevented membership representative of the community.

■ Skaggs claims that the jury commissioners from Barren County used voter and property tax lists from which to select potential jurors. Skaggs suggests that the voter registration list improperly under-represented persons under the age of 35, less educated people and unskilled workers. Similarly, he contends that the property tax list excludes persons too poor to own property. Additionally, Skaggs relies on the testimony of one jury commissioner—Gilbert James—to support his argument that the jury commissioners did not adhere to random selection and, rather, made deliberate decisions to exclude certain individuals (*e.g.*, older people, "sickly" people, persons for whom jury service would be a hardship, etc.).

The court construes the argument as one premised on the Sixth Amendment to the United States Constitution.

> Jury wheels, pools of names, panels, or venires from which juries are drawn must not systemically exclude distinctive groups in the community and thereby fail to be reasonably representative.

*Duren v. Missouri,* 439 U.S. 357, 363–64, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) (quoting *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)). The *Duren* Court established the framework for addressing challenges to jury composition allegedly in violation of the Sixth Amendment.

■ The Court determined that a defendant must show three things in order to establish a prima facie violation of the fair-cross-section requirement. First, the defendant must show that the group alleged to be excluded is a "distinctive" group in the community. *Id.* at 364, 99 S.Ct. 664. Second, the defendant must show that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community. *Id.* Finally, the defendant must show that the underrepresentation is due to systematic exclusion of this group in the jury-selection process. *Id.* Once the de-

fendant has established a prima facie violation, the state bears the burden of justifying the challenged infringement. *Id.* at 367, 99 S.Ct. 664. The state must demonstrate an interest that is manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group. *Id.* at 367–78, 99 S.Ct. 664.

Skaggs has failed to meet any of the criteria set forth in *Duren.* He has not shown that any of the identified groups are "distinctive" in the community. He offered no statistical data from which this court might determine the percentage of the community made up of any of the identified groups. "The defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement." *Duren,* 439 U.S. at 364, 99 S.Ct. 664. Finally, Skaggs has not shown that the alleged underrepresentation of any of the identified groups—both generally and on his grand jury and venire panel—was due to their systematic exclusion in the jury selection process.

Therefore, he has failed to demonstrate a Sixth Amendment fair-cross-section representation violation. A writ of habeas corpus, consequently, will not issue on this claim.

### XXIII.

**Skaggs Insists that Kentucky's Death Penalty Statute is Unconstitutional On Its Face**

■ Skaggs claims that Kentucky's death penalty statute is unconstitutional on its face. In support of this position, he sets forth numerous arguments concerning the statute's alleged failure to adequately define terms, assign burdens of proof or require appropriate findings as a condition necessary for imposition of the death sentence. Kentucky's death penalty statute is set forth in KRS § 532.025.

**25.** Although Skaggs raised this argument on direct appeal, the Kentucky Supreme Court made

The Sixth Circuit Court of Appeals recently considered a claim challenging the constitutionality of Kentucky's death penalty statute in *McQueen v. Scroggy,* 99 F.3d 1302 (6th Cir.1996). In reviewing the claim, the court compared Kentucky's statute to the death penalty statute in Georgia.

> Kentucky's death penalty statute is modeled after the Georgia death penalty statute. The Georgia statute has consistently been held to be constitutional by the Supreme Court. *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

*McQueen,* 99 F.3d at 1333.

The Kentucky death penalty statute is not unconstitutional on its face. *See id.* The issue does not, therefore, warrant granting the writ of habeas corpus.

### XXIV.

**Skaggs Objects to the Trial Court's Failure to Require Findings on Mitigating Circumstances at the Penalty Phase of the Trial**

Skaggs contends that an error occurred due to the trial court's failure to require specific findings regarding which mitigating circumstances were found to exist and which were rejected. The Court has already addressed this same argument in Section XXII(E), *supra.*

### XXV.

**Skaggs Alleges that the Trial Court Committed Constitutional Error by Failing to Exercise Its Discretion in Any Meaningful Way in Determining Whether the Death Sentence Should Be Imposed**

■ Skaggs next complains that the trial judge committed constitutional error by failing to make "an independent, reasoned, factual determination" to impose the death penalty.[25] In this regard, Skaggs relies on

no specific findings on this issue. *See generally*

sentencing remarks make by the trial judge which Skaggs maintains indicate that the judge failed to make an independent judgment whether or not to impose the death penalty.

> Now, actually, there's not much the court can say, because this proceeding has lasted almost a year, and we have had two trials . . . an in my opinion, he has had a fair trial from every standpoint. . . .
>
> * * * * * *
>
> No, on [the two counts of murder], the jury recommended in this case—it was a hard decision for the jury to make, ad [sic] we all that were present during the trial and participated it or witnessed it—and they made it and recommended on each of those two counts, Count One and Two, that the defendant be sentenced to death for the murder of Herman Matthews and be sentenced to death for the murder of Mae Matthews, and the court knows of no reason at all why—the court can't think of any reason at all why the court could not or should not follow the recommendation of the jury. . . .

TE XVIII at 2508–09, 2510.

■ Initially, the Court notes that, contrary to Skaggs' assertion, the trial judge did make an independent, reasoned, factual determination to impose the death penalty. On July 13, 1982, the trial judge entered a Final Judgment and Sentence of Death on both counts of murder. For each murder, the trial judge fixed Skaggs' penalty at death by electrocution noting, in pertinent part, that

> having reviewed the findings of fact by the sentencing jury, and the background of the defendant, as well as the report of the office of probation and parole, and having heard argument of counsel, the Court inquired of the defendant and his counsel whether they had any legal cause to show why judgment should not be pronounced and afforded the defendant and his counsel an opportunity to make statements in his behalf and to present any information in mitigation of punishment, and the Court having provided the defendant, through his attorneys, with a copy of the written re-

port of the pre-sentence investigation prepared by the division of probation and parole, and the defendant having been given an opportunity to state his version of any facts or conclusions contained in the said report, and the Court having given due consideration to the report of the pre-sentence investigation prepared by the division of probation and parole and to the defendant's background and the matter and circumstances of this crime and to the history, character and condition of the defendant. . . .

See TR IX at 1200–01, 1204–05. Moreover, assuming arguendo that the above-referenced excerpt does not establish that the judge made a reasoned, independent, factual determination to impose the death penalty, Skaggs has failed to establish that he has a constitutional right to the same. Rather, the Constitution merely requires that a state sentencing scheme "adequately channels the sentencer's discretion so as to prevent arbitrary results." *Harris v. Alabama*, 513 U.S. 504, 115 S.Ct. 1031, 1035, 130 L.Ed.2d 1004 (1995). For the reasons set forth in Sections XXVII, XXVIII, *infra*, the Court rejects that Kentucky's sentencing scheme operates in an arbitrary manner.

### XXVI.

*Skaggs Maintains that His Eighth and Fourteenth Amendment Rights to Present Mitigation Evidence In Support of a Penalty Other Than Death Were Violated by the Commonwealth's Improper Rebuttal of Skaggs' Mitigating Evidence*

■ At the penalty phase of the trial, Skaggs introduced substantial evidence, through Elya Bresler, to support that at the time the crimes were committed Skaggs' capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease. Bresler testified that Skaggs was suffering from "a major depressive disorder" and a "paranoid personality disorder." TE VII at 2354. Bresler specifically testified that these conditions would impair Skaggs ability to appreciate the

nature of his conduct and to conform his conduct to the requirements of law.

In an effort to rebut Skaggs' proof of this mitigating evidence, the Commonwealth introduced the testimony of Dr. Pran Ravani, who gave the following testimony regarding Skaggs' mental state at the time of the crimes:

Q. Do you have a medical psychiatric opinion, based upon reasonable certainty, whether at the time of the murders in this case, and robberies and burglary, which was May 6, 1981, that the defendant had substantial mental capacity to appreciate the criminality of his conduct?

Mr. Kirwan: Judge, the jury has found that he is guilty, and they were instructed on insanity, and they found that he was not insane—

The Court: Overruled

Mr. Kirwan:—at the time of the offense, and I would say that question is irrelevant for purposes of sentencing at this time.

The Court: Overruled.

A. In answer to your question, if patient's condition was the same on the day of the alleged crime as it is now during that examination which I had during those nineteen days period of time, then and then, in all medical probability, this patient had the substantial capacity to either appreciate the criminality of his conduct or to conform his conduct to the requirements of the law on the day of the alleged crime.

TE XVII at 2420–21. Skaggs maintains that Ravani's testimony, although relevant to controvert an insanity defense, had absolutely no bearing on whether his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Skaggs alleges that this irrelevant and highly prejudicial testimony, which was heavily relied on by the Commonwealth in closing argument in the sentencing phase, misrepresented the sentencing issue as whether the existence or absence of sanity should be considered to mitigate the crime and serve as a reason for a sentence of less than death. Skaggs argues that Ravani's testimony effectively misled the jury into believing that his mental "impairment" needed to meet the higher criminal responsibility

standard in order for the jury to consider it mitigating.

The Court finds this argument meritless. Initially, the Court notes that the Kentucky Supreme Court rejected this argument on direct appeal.

The prosecution's rebuttal of the mitigating evidence presented by Skaggs was not reversible and did not affect the right of Skaggs to present such evidence. The testimony of Dr. Ravani was appropriate as rebuttal to the testimony of Dr. Bresler, and the result of the conflicting evidence did not deny Skaggs his right to present mitigating evidence. The two psychiatric experts disagreed as the state of the mental health of the defendant and his ability or capacity regarding the murders. Skaggs was not denied an opportunity to present mitigating evidence, that evidence was merely disputed. The jury was properly instructed in accordance with the statutes in this respect.

*Skaggs,* 694 S.W.2d at 678. Contrary to Skaggs' assertions, Ravani's testimony was relevant to the impaired mental capacity mitigating circumstance as defined in KRS 532.025(2)(b). The Court finds no support for the proposition that the testimony at issue was inadmissible or prejudicial, much less that admission of the testimony compromised Skaggs' constitutional right to a fair trial.

## XXVII.

***Skaggs maintains His Sentence of Death is Inappropriate, Arbitrary, Cruel, Unusual and is Disproportionate to Sentences Received in Similar Cases***

Skaggs attacks the functioning of the Kentucky death penalty statute. He also contends that the death penalty scheme is unconstitutional as applied specifically to his case. The claims must fail.

In support of the claims, Skaggs contends that the mitigating circumstances presented during his trial outweighed the aggravating circumstances. He also alleges that other capital defendants escaped the death penalty despite the fact that they were equally or

more deserving of the death penalty than he is.

Skaggs first contends that the death sentence should be set aside because the mitigating circumstances specific to him outweighed the aggravating factors introduced during the penalty phase of his trial. He relies on evidence of his difficult and troubled personal history (including birth in an insane asylum, being raised by grandparents, having never known his mother, possible brain damage, mental infirmities and childhood abuse). Skaggs also points out that at the time of the offense he did not have a substantial history of serious assaultive convictions. Finally, he suggests that his confessions to the crimes and the fact that he assisted police in finding evidence related to the case demonstrate mitigating factors for consideration regarding sentencing.

Skaggs correctly noted in an earlier argument that the Kentucky death penalty statute does not require the weighing of aggravating and mitigating factors. No authority has been cited for the proposition presented by Skaggs (*i.e.,* if mitigating factors outweigh aggravating factors—a death sentence may not be imposed). Kentucky is not a "balancing" state with respect to capital sentencing. *McQueen,* 99 F.3d at 1332. In Kentucky, a jury can refuse to recommend the death penalty simply as an act of mercy, even if *no* mitigating circumstances are presented. *Id.* [Emphasis in original]. On the other hand, the jury can recommend the death penalty despite the presence of a mitigating circumstance, so long as the defendant is "death qualified" by the presence of one statutory aggravating factor. *Id.*

Furthermore, during the Kentucky Supreme Court's initial review of Skaggs' direct appeal of his conviction, the court found that

> [t]he jury was well aware that it need not sentence Skaggs to death even if it found an aggravating circumstance. A careful examination of the entire jury charge indicated that the jury knew it could recommend a life sentence even if it found an aggravating circumstance beyond a reasonable doubt.

*Skaggs v. Commonwealth,* 694 S.W.2d 672, 679 (Ky.1985). The court went on to note that the jury had properly been instructed on the nature of mitigation and was admonished to apply that law only to the evidence presented. *Id.* at 680. "There is no requirement that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt" in order to recommend imposition of the death sentence. *Id.* (citation omitted). The Court agrees.

Next, petitioner claims that his death sentence is disproportionate to the sentences received by other defendants charged with capital offenses. "There is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review." *Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *McQueen,* 99 F.3d at 1333–34. The Supreme Court of Kentucky, however, conducted such a review in this case. The court determined that the sentence was not disproportionate to the crime committed. *Skaggs,* 694 S.W.2d at 682. Skaggs offers no factual or legal basis for reversing the Kentucky Supreme Court's determination.

The Constitution simply requires that the death penalty be an individualized sanction based on both the nature of the crime and the criminal. *McQueen,* 99 F.3d at 1334. The jury, sentencing judge and Kentucky Supreme Court provided Skaggs with such an assessment at all levels of his criminal prosecution and appeal. "That the decision was adverse does not make it unconstitutional." *Id.* Accordingly, a writ of habeas corpus cannot issue on these claims.

## XXVIII.

### *Skaggs Argues that Kentucky's Death Penalty Statute Operates in an Arbitrary, Discriminatory and Freakish Manner*

Petitioner claims that prosecutors in Kentucky seek the death penalty in an arbitrary, discriminatory and freakish manner. He cites to statistical data in support of an argument that the death penalty is applied more frequently to blacks than whites.

The Sixth Circuit squarely addressed this issue in *McQueen v. Scroggy,* 99 F.3d 1302

(6th Cir.1996). The court pointed out two flaws with the argument. The McQueen court's reasoning and holding are directly on point with the case at bar.

First, Skaggs, like McQueen, is a white male. He was charged and convicted of murdering a white male and female. "Under these conditions, it is doubtful that [Skaggs'] claim that the operation of Kentucky's death penalty statute is racially biased has anything other than an academic relevance to this case." *See McQueen,* 99 F.3d at 1333. Second, the statistical data referenced by Skaggs "amounts to the same kind of statistical studies that the Supreme Court found insufficient in *McCleskey v. Kemp,* 481 U.S. 279, 297, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)." *Id.*

The arguments set forth in the petition regarding this claim are simply inapplicable to Skaggs personally. They do not demonstrate a basis for granting the writ of habeas corpus.

## XXIX.

*Skaggs Alleges That He Was Denied His Constitutional Right to a Fair Trial and an Impartial Jury By Prosecutorial References, in Front of the Jury, to the Fact That Material Was Deleted from His Confession*

■ Skaggs next argues that his constitutional rights were violated by certain comments made by the prosecutor at the guilt phase of the trial suggesting that a portion of Skaggs' confession had been deleted. Skaggs maintains that the comments were highly improper and prejudiced his due process rights to a fair trial and an impartial jury.

Prior to trial, Skaggs moved the trial court to excise allegedly irrelevant and prejudicial material from Skaggs' confession before it was introduced into evidence. The court agreed with Skaggs' request to excise portions of the confession and refused to advise the jury that portions of the confession had been deleted. After this ruling, the prosecution elected to have Tim O'Dell, one of the lead investigating officers, read the confession from the witness stand without reading the excised portions.

At one point, the prosecutor interrupted O'Dell's reading of the confession and stated:

Prosecutor: Judge, the next three was, I believe was supposed to be blanked out. Just skip those.

Defense Counsel Kirwan: They are not on mine.

Defense Counsel Proctor: No, they are not. Can we approach the bench?

TE VIII at 1013. At the bench conference which followed, the parties agreed that the words at issue were not, in fact, part of the confession deleted by the Court. O'Dell then resumed reading the confession.

Skaggs maintains the prejudicial effect of the prosecutor's statement was compounded by a subsequent remark made by O'Dell while reading the confession.

My question: This entire statement that you have given, you have given of your free will, is that right? His response: Yes—or yeah. My question: Without threat? *There's a section here deleted, and then the next thing that's—okay, next question was:* You telling me the truth last night when you said that you hadn't seen Terry about a year?

TE VIII at 1031 [Emphasis added]

■ "When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dept. of Corrections,* 4 F.3d 1348, 1355 (6th Cir.1993) (quoting *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). Thus, the role of the habeas court is to determine whether the conduct was "so egregious as to render the entire trial fundamentally unfair." *Id.*

In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the

jury, and the strength of the competent proof to establish the guilt of the accused. *Id.*

In the present case, the remarks did not render Skaggs' trial fundamentally unfair. First, the remarks were isolated and thus less likely to cause prejudice. Moreover, mere reference to the fact that parts of a confession have been excised does not possess the same inherently prejudicial quality as, for example, the improper admission of evidence regarding prior criminal acts. Furthermore, there is nothing to suggest that the statement was intentionally made—particularly in light of the fact that the words had not, in fact, been excised from the confession. Finally, there was a great deal of credible evidence supporting Skaggs' guilt. Under the circumstances, it is not likely that the prosecutor's remark would have influenced the jury's verdict to any appreciable degree so as to render Skaggs' trial fundamentally unfair.

## XXX.

*Skaggs Asserts that the Trial Court Committed Constitutional Error by Improperly Instructing the Second Jury that Skaggs Had Already Been Found Guilty*

■ Skaggs maintains that the judge committed error of constitutional proportion by improperly instructing the jury that Skaggs had already been found guilty of the charged crimes. Skaggs argues that instructing the sentencing jury regarding his guilt prevented the jury from considering his individual culpability, the circumstances of the offense, and any lingering or residual doubt the jury may have had about his guilt.

■ This argument also must fail. Although courts have recognized the existence of residual doubt and acknowledged its value to a capital defendant, *see e.g., Lockhart v. McCree*, 476 U.S. 162, 180–82, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Smith v. Balkcom*, 660 F.2d 573, 580–81 (5th Cir.1981), *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982), the Supreme Court has specifically rejected that "capital defendants have a *right* to demand jury consideration of 'residual doubts' in the sentencing phase."

*Franklin v. Lynaugh*, 487 U.S. 164, 173, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) [Emphasis in original]. Contrary to Skaggs' assertions, residual doubt does not relate to any aspect of his character, record or to the circumstances surrounding the offense. *See id.* at 174, 108 S.Ct. 2320. Most notably, "[f]inding a constitutional right to rely on a guilt-phase jury's 'residual doubts' about innocence when the defense presents its mitigating case in the penalty phase is arguably inconsistent with the common practice of allowing penalty-only trials on remand of cases where a death sentence—but not the underlying conviction—is struck down on appeal." *Id.* at 173 n. 6, 108 S.Ct. 2320.

## XXXI.

*Skaggs Alleges He Was Denied His Constitutional Rights to a Fair Trial and an Impartial Jury by the Trial Court's Refusal to Allow Him Increased Peremptory challenges on the Retrial of his Case*

Skaggs assigns constitutional error to the trial court's denial of Skaggs' motion for an increase in the number of peremptory challenges he could exercise in the penalty phase retrial. The Court finds no need to detail Skaggs' specific arguments on this issue. As previously discussed, *see* Section XVIII, *supra*, the Supreme Court has held that there is no federal constitutional right to peremptory challenges. *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

## XXXII.

*Skaggs Maintains that Kentucky Violated His Constitutional Guarantee Against Double Jeopardy and His Rights Under the Eighth Amendment by Permitting Retrial After He Was Forced to Seek a Mistrial During the Penalty Phase of the First Trial*

■ Skaggs claims that the second penalty phase trial, which resulted in the jury's recommendation of the death sentence, violated his right to be free from double jeopardy. He also claims that the penalty phase retrial violated his rights under the Eighth

Amendment to the United States Constitution.

Trials for capital offenses in Kentucky are bifurcated. *See* KRS § 532.025. The first stage of the trial concerns guilt only. *Id.* If the fact finder (either court or jury) finds the defendant guilty of the charged capital offense, the penalty phase of the trial is held. *Id.* During the penalty phase, additional evidence is presented. *Id.* When the evidence is presented to a jury, the jury is instructed to render a verdict with a recommendation for sentencing. *Id.* The judge must fix the sentence within the limits prescribed by law and based upon the findings of the jury. *Id.*

During jury deliberations following the first penalty phase trial, the jury foreman approached the trial judge and indicated that the jury had a question. The question concerned the definition of a life sentence and specifically whether Skaggs would be eligible for parole. The judge advised the foreman that "that's matters that the court nor nobody else is allowed to discuss. You are supposed to go by the instructions and the evidence. That's out of your range of consideration." TE XI at 1496.

The next day, a specific juror—Smith—approached the trial judge with a question. With the agreement of counsel, the judge met with Juror Smith in chambers. During the conference in chambers, Smith asked about the definition of life imprisonment and particularly, whether Skaggs would be eligible for parole. The record reflects that the judge informed Smith, several times, that the law did not define life imprisonment. He went on to advise Smith that speculation on the issue of parole was forbidden to jurors. The court, however, also advised Smith that the law of Kentucky would allow the governor to issue the defendant a pardon for the crimes—and added the caveat that, like the issue of parole, the jury should not speculate regarding the issue of pardon.

Skaggs contends that the judge's remarks regarding a life sentence as well as the possibility of pardon were designed to influence the jury. He claims that the judge's comments ultimately caused the jury to deadlock during their deliberations. Consequently, Skaggs asserts that he was left no choice but to move for a mistrial or continue with a jury that had been tainted in favor of death due to the judge's remarks. Trial counsel for Skaggs moved for a mistrial. The judge granted the motion.

The parties presented evidence regarding penalty to a new jury panel. At the conclusion of proof, the jury returned a verdict and recommended the sentence of death for each count of murder charged in the indictment. The trial judge followed the jury's recommendation and sentenced Skaggs to the death penalty.

 Skaggs claims that the second penalty phase trial before the new jury panel violated his protection against double jeopardy. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense.[26] *United States v. Dinitz,* 424 U.S. 600, 606, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (citations omitted). The underpinning of this constitutional safeguard is based on the belief that

> The State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Id.* (citation omitted). Distinctions are drawn between mistrials granted on the defendant's motion and mistrials declared without the defendant's request or consent. *Id.* at 607, 96 S.Ct. 1075. Reprosecution is generally permissible if the declaration of mistrial came at the request or with the acquiescence of the defendant. *Id.* at 606–610, 96 S.Ct. 1075. In the absence of such consent by the defendant, a retrial may proceed without violating double jeopardy principles if

---

**26.** The Supreme Court held the Double Jeopardy Clause of the Fifth Amendment applicable to the States through the Fourteenth Amendment in *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

there was "manifest necessity" for declaring the mistrial. *Richardson v. United States,* 468 U.S. 317, 323–24, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984). The Supreme Court has consistently adhered to the rule that a "hung jury" constitutes manifest necessity. *Id.*[27] Therefore, retrial following a hung jury does not violate the Double Jeopardy Clause. *Id.*

The record clearly shows that Skaggs' counsel moved the trial court to grant a mistrial based on the first penalty phase jury's inability to reach a unanimous verdict. Because Skaggs sought and agreed to the mistrial, the retrial was permissible. *See Dinitz,* 424 U.S. at 606–10, 96 S.Ct. 1075.

 Nevertheless, Skaggs argues that he was forced to seek the retrial due to the trial judge's misconduct (*i.e.,* improper statements made to juror Smith). The *Dinitz* Court recognized an exception to the general rule regarding mistrial prompted by a defense request. The Court held that

[t]he Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where 'bad-faith conduct by judge or prosecutor' (citation omitted), threatens the '(h)arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant.

*Dinitz,* 424 U.S. at 611, 96 S.Ct. 1075 (citations omitted). The Supreme Court narrowed the exception to circumstances where the prosecution or presiding judge deliberately attempted to "goad" the defendant into making a motion for mistrial. *Oregon v. Kennedy,* 456 U.S. 667, 674–76, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). Although misconduct constituting "harassment or overreaching" must occur, it is not a sufficient

condition for triggering the exception—the judge must intend "to subvert the protections afforded by the Double Jeopardy Clause." *Id.* at 675–76, 102 S.Ct. 2083. A finding regarding the intent of the judge is a finding of fact relating to the "objective facts and circumstances" of each case. *Id.* at 675, 102 S.Ct. 2083.

This Circuit restated the *Kennedy* test and indicated that only behavior which "was intentionally calculated to cause or invite mistrial" will bar a retrial. *United States v. Thomas,* 728 F.2d 313, 318 (6th Cir.1984). In determining whether the requisite intent was present, this court should consider the following factors:

1) whether there was a "sequence of overreaching prior to the single prejudicial" incident;

2) whether the judge resisted or was surprised by the defendant's motion for mistrial; and

3) the findings of the trial and appellate courts concerning the intent of the judge.

*Kennedy,* 456 U.S. at 680, 102 S.Ct. 2083 (Powell, J., concurring); *United States v. White,* 914 F.2d 747, 752 (6th Cir.1990).

 The Kentucky Supreme Court determined that the record failed to demonstrate any intent by the trial judge "to provoke a mistrial out of fear that the jury was likely to return a life sentence." *Skaggs,* 694 S.W.2d at 681. Skaggs bears the burden of establishing by convincing evidence that this factual determination by the Kentucky Supreme Court is erroneous. *See* 28 U.S.C. § 2254(d) (prior to enactment of Antiterrorism and Effective Death Penalty Act[28]); *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (per curiam); *Levine v. Torvik,* 986 F.2d 1506, 1514 (6th Cir.), *cert. denied,* 509 U.S. 907, 113 S.Ct. 3001, 125 L.Ed.2d 694 (1993).

---

**27.** The *Richardson* Court noted that "it has been established for 160 years, since the opinion of Justice Story in *United States v. Perez,* 9 Wheat. 579, 6 L.Ed. 165 (1824), that the failure of the jury to agree on a verdict was an instance of 'manifest necessity' which permitted a trial judge to terminate the first trial and retry the defendant, because 'the ends of public justice would

otherwise be defeated.'" 468 U.S. at 323–24, 104 S.Ct. 3081 (quoting *Perez* ).

**28.** By prior memorandum opinion and order, this Court determined that the amendments contained in the AEDPA would not be applied to the instant petition due to the fact that the petition had been filed prior to enactment of the AEDPA.

Skaggs has failed to show that the Kentucky Supreme Court's factual determinations were erroneous regarding the trial judge's comments and intent. Furthermore, this court agrees with the Kentucky Supreme Court's findings on this issue. The record reflects that the trial court's complete conversation with Juror Smith was intended to advise the juror that the jury should return a verdict in accordance with the evidence and the law as explained in the jury instructions. He clearly admonished the juror not to consider factors outside those set forth in the instructions. Nothing in the record demonstrates bad faith on the part of the trial judge. Similarly, the record does not evidence any effort on the part of the judge to manipulate the jury for the purpose of causing a mistrial.

Jeopardy did not attach to the first penalty phase trial. Therefore, the second penalty phase trial did not violate Skaggs' protection against double jeopardy.

■■■ Skaggs also claims that the second penalty phase trial violated his rights under the Eighth Amendment to the United States Constitution. He does not clearly define the parameters or substance of this claim. To the extent that he claims that the death sentence, resulting from the retrial, itself violates his rights under the Eighth Amendment, the claim must fail. The Supreme Court determined that the sentence of death did not in and of itself violate the Eighth Amendment's prohibition against cruel and unusual punishment when it is imposed for the crime of murder.[29] *See Gregg v. Georgia,* 428 U.S. 153, 186–87, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Furthermore, the retrial standing alone did not constitute a form of cruel and unusual punishment.

Skaggs has failed to show violation of his rights under either the Double Jeopardy Clause or the Eighth Amendment. A writ of habeas corpus will not issue on these grounds.

---

**29.** This court notes that the Supreme Court has recognized certain criteria which must be met in order for a State's death penalty statute to pass constitutional muster. However, as previously

## XXXIII.

### *Skaggs Insists That His Death Sentences Were Obtained in Violation of Protection Against Double Jeopardy*

■■■ In his final argument, Skaggs again claims that imposition of the death sentence following retrial of the penalty phase violated his right to be protected from double jeopardy. However, with regard to this specific claim, he contends that the double jeopardy violation occurred because the judge imposed the death sentence after the first penalty phase jury became deadlocked and, therefore, unable to reach a unanimous verdict.

Skaggs claims that he moved the trial court to exclude death as a possible punishment during the penalty phase retrial based on the fact that the first penalty phase jury had deadlocked on the issue. The trial court denied the request and allowed the penalty phase retrial jury to consider death as a possible punishment. The second penalty phase jury recommended a death sentence for both the murder of Mr. Matthews and the murder of Mrs. Matthews.

The double jeopardy claim premised on these arguments cannot stand. For the reasons set forth more fully in Section XXXII, *supra,* retrial of the penalty phase did not violate principles of double jeopardy. Skaggs offers no authority for the proposition that the first jury's inability to reach a unanimous decision regarding punishment bars the retrial jury from considering death as an appropriate punishment. This court is aware of no such authority.

The failure of a jury to reach a verdict during the penalty phase of a capital case results in a mistrial and permits the matter to be retried. *See Skaggs,* 694 S.W.2d at 681 (citation omitted). Furthermore, Kentucky's death penalty statute clearly contemplates a jury recommendation in death penalty cases tried by a jury. *See* KRS § 532.025(1)(b); *Skaggs,* 694 S.W.2d at 681. In the absence of findings by a jury where the jury is deadlocked, the trial judge has no authority to fix

discussed, *supra,* Kentucky's death penalty statute meets those requirements and has been held to be constitutional. *See McQueen v. Scroggy,* 99 F.3d 1302, 1333 (6th Cir.1996).

any sentence. *Id.; see Commonwealth v. Crooks,* 655 S.W.2d 475 (Ky.1983).

The trial judge properly submitted all possible punishments, including death, to the penalty phase retrial jury. In so doing, the court did not violate Skaggs' protection against double jeopardy.

### CONCLUSION

The Court has painstakingly and deliberately considered the arguments and issues presented on Mr. Skaggs' behalf and finds no indication that the state court proceedings violated the mandates of the federal Constitution. Having made this determination, it is this Court's duty to deny Mr. Skaggs' petition for writ of habeas corpus. Accordingly, by separate Order, the Court will deny the petition for writ of habeas corpus and dismiss the action.

### *ORDER*

On Motion of Petitioner, David Leroy Skaggs, and the Court being sufficiently advised,

**IT IS HEREBY ORDERED** that Petitioner's Motion to Alter or Amend the Court's Judgment [DN30] entered on July 24, 1998 is **denied.**

### *ORDER*

For the reasons set forth in the Memorandum Opinion entered this date, **IT IS ORDERED** that the petition for writ of habeas corpus is **denied** and the action is **dismissed.** There being no just reason for delay in its entry, this is a final Order.

The Court **grants** Petitioner leave to appeal to the Court of Appeals *in forma pauperis,* pursuant to 28 U.S.C. § 1915(a)(3), by issuing a certificate of probable cause pursuant to 28 U.S.C. § 2253 (1994).